Clara B. JONES, Appellee,

v.

Ray M. DODSON, both individually and in his capacity of Sheriff of Page County, Appellant.

Edward M. SEDWICK, Appellant,

v.

Ray M. DODSON, Individually and in his capacity of Sheriff of Page County, Appellee.

Nos. 81–2060, 81–2091.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 9, 1983.

Decided Feb. 7, 1984.

Edward J. White, Alexandria, Va. (George W. Shanks, Luray, Va., on brief), for appellant.

Douglas L. Guynn, Harrisonburg (Phillip C. Stone, Wharton, Aldhizer & Weaver, Harrisonburg, on brief), for appellee.

Before PHILLIPS, and CHAPMAN, Circuit Judges, THOMAS E. FAIRCHILD, Senior United States Circuit Judge for the Seventh Circuit, sitting by designation.

JAMES DICKSON PHILLIPS, Circuit Judge:

Plaintiffs Clara B. Jones and Edward M. Sedwick brought this action under 42 U.S.C. § 1983 against Sheriff Ray M. Dodson for wrongfully discharging them from the Sheriff's Department because of their political affiliations and expressions. The jury returned a verdict for the plaintiffs on both claims. On Dodson's motion for judgment n.o.v., the district court upheld the verdict in favor of Jones[1] but granted judgment notwithstanding the verdict on the claim by Sedwick. On cross-appeals by the aggrieved parties, we conclude that the court failed properly to apply controlling doctrine in critical respects prejudicial to Sedwick on his claim and to Dodson on Jones's claim. On that basis we vacate the judgment and remand for limited new trials as to both claims.

## I

This controversy arises from an imbroglio of criminal activity and political machination in the Page County, Virginia, Sheriff's Department in the mid-1970's. The only undisputed facts of the case are that Jones and Sedwick, two Democratic department employees hired by an incumbent Democratic Sheriff, were "terminated" by the Republican successor to that office. The reasons for the discharges and other issues were hotly disputed by the parties but were resolved by the jury in favor of Jones and Sedwick.

1. Subsequent to the entry of the final orders below, Dodson filed a voluntary petition in bankruptcy and received a discharge from the judgment in this case. This appeal thus relates only to the liability of Dodson in his official capacity as Sheriff of Page County, Virginia.

Sedwick, a lifelong Democrat active at times in party affairs, joined the Page County Sheriff's Department in 1968 as a regular deputy under the then newly-elected Democratic Sheriff, Kenneth E. Kerkhoff. Sedwick and Kerkhoff had been friends before this time, and this friendship plus Sedwick's meritorious service to the department prompted Kerkhoff to elevate Sedwick to "Chief Deputy" with a rank of "lieutenant" in 1973. The promotion was more illusory than real, however, because it seemingly entailed nothing more than adding lieutenant's bars to the collar of Sedwick's uniform. Sedwick was given no additional duties or responsibilities and his salary was unaffected.

In the mid-1970's, the department was scandalized by allegations that acts of corruption and criminal activity were being committed by members of the department. In January of 1976, the Page County Circuit Court removed Kerkhoff as sheriff and appointed Sedwick as interim sheriff. One month later, the Circuit Court appointed Dodson, a Republican, to replace Sedwick as acting sheriff until the regular elections were held in November. The contested discharges in this case took place during the time Dodson was acting sheriff—a time when politics and the Sheriff's Department were hotly discussed topics in Page County. Dodson was a candidate for the office of sheriff in the November election.

Aware of the political climate prevailing at the time of his ascension to office, Dodson informed all employees of the department that they were to stay out of politics, to concentrate on their work, and to leave political matters to him. Dodson testified at trial that he meant this prohibition to apply only while the employees were on duty; he did not care what political activity the employees engaged in while off duty. Dodson also testified that he abided by his own regulation, campaigning only during

off-duty hours and using his personal car, and that he did not ask his employees to campaign or vote for him.

Dodson retained Sedwick during this interregnum, and there has not been any question about the adequacy of Sedwick's professional performance. On September 15, 1976, however, Dodson confronted Sedwick with allegations that Sedwick had been actively campaigning against him. Dodson testified that he had been advised that Sedwick, while on duty, had organized and attended a political meeting at Sedwick's home. The meeting, also attended by former Sheriff Kerkhoff, two former deputies, and Norris Richards, another current deputy of the department, was allegedly designed to promote Kerkhoff's candidacy for sheriff as an independent.

The parties' recollection of events at this point varied widely. Dodson claimed that he had heard of this meeting only several days before he confronted Sedwick on September 15. On that day, Dodson first asked Norris Richards about the meeting; Richards allegedly admitted attending the meeting but left once he realized it was a political meeting. (Richards did not testify at trial.) Dodson testified that he did not fire Richards because Richards had been honest with him.

Several hours later, Dodson asked Sedwick about the meeting. Dodson testified that Sedwick denied that the meeting ever took place; when told of Richard's "confession," Sedwick became verbally abusive and declared he would do as he pleased and that he hoped Kerkhoff would win the next election for sheriff. Upon hearing this, Dodson handed Sedwick a previously-typed letter terminating his employment for campaigning against him: "I feel that since you have been campaigning against me I must in all good faith to the Republican Party and myself release you from duty."[2]

2. In its entirety, the letter from Dodson to Sedwick read:

In reference to our conversation this date, this is to inform you that your services with the Page County Sheriff's Department will

cease at the end of your time of duty this date.

As you know from our meeting of February 12, 1976, I informed all of the employees that they did not have to worry about their jobs or about getting fired as long as their duties

Sedwick, not surprisingly, recalled all this differently. Sedwick's version was that Dodson did ask him about the meeting, but Sedwick never denied (or admitted) attending it. Dodson then asked Sedwick to resign, and when Sedwick refused to do so Dodson presented him with the letter of discharge. Sedwick testified at trial that the meeting was held in late June of 1976—well over two months before Dodson fired him—and that the meeting occurred while Sedwick was off duty. Sedwick also testified that no campaigning or political activity took place; rather, the meeting was simply a social gathering of old friends who engaged in some general conversation about politics while enjoying beer and pretzels out in the carport.

At trial, Dodson claimed that he discharged Sedwick for actively campaigning against him at this political meeting while on duty. Dodson did not know what had actually occurred at the meeting and on cross-examination he stated repeatedly that he did not know whether Sedwick was actually on duty or not. He also made no effort to determine by checking duty logs or other sources whether Sedwick was on or off duty at the time, but rather relied on the word of an informer (who had not attended the meeting).

On September 26, 1976, less than two weeks after Sedwick was fired, Dodson also discharged Clara Jones from the department. Jones had joined the department under Sheriff Kerkhoff in 1970 as a dispatcher, an unsworn position. She was an active Democrat and a supporter of Kerk-

hoff even while employed by Dodson. As with Sedwick's discharge, the parties are in dispute over the circumstances surrounding Jones's discharge.

Dodson testified that in the late afternoon of September 26, a deputy at the office called him at home to inform him that several women were in the office paying a social visit on Jones. According to Dodson, this was in violation of his policy against non-business visitors loafing in the office. Dodson went to the office to ask Jones about the visitors and Jones replied that she could talk to whom she pleased. During the conversation Jones also said she hoped that Kerkhoff would get re-elected and that she would work for his success. Dodson assumed that Jones was working for Kerkhoff and became "agitated" by her response; he told her that she was fired but refused to give her a letter like the one given to Sedwick.

Jones's version again differs markedly from Dodson's. Jones testified that the women came to the office uninvited on the night of the 25th around midnight and that they engaged in some general, non-political conversation with Jones and several others in the office for about fifteen minutes. When Dodson asked her the next day about the visit, he gently remonstrated with her for having the visitors and then inquired who she planned to vote for. When she replied "Kerkhoff," he got angry and fired her.

Dodson's claimed reason for firing Jones was for violating the no-visitor rule and then being insubordinate.[3] This was dis-

were performed in a proper manner and that they did not become actively involved in politics against me. This I again assured you of on September 10, 1976. However you and Sgt. Richards must not have believed this. Since I have been informed of your meeting with Kenneth Kerkhoff, Merle Ripple and Carroll Cave, I feel that since you have been actively campaigning against me I must in all good faith to the Republican Party and to myself release you from duty.

You will turn in your vehicle, identification card and badge and all County property to this office upon the end of duty on September 15, 1976. You will be paid for any vacation time that you have accumulated.

Dodson claimed he had prepared a similar letter with which to discharge Norris Richards, but then decided to retain Richards because of his "honesty."

**3.** Dodson also alleged that he fired Jones partly because of her past work performance. However, he admitted on direct examination that he did not confront her on the day of her discharge about any issues of past performance and that his sole purpose in going to the office was to deal with the breach of the no-visitor regulation. Dodson presented no evidence to support his allegation of inadequate performance and Jones denied that he had ever mentioned any problem with her performance. The

puted by Jones's testimony that she had never been informed of any such policy and had in fact been present when Dodson removed "No Loafing" signs that Kerkhoff had installed in the office. Dodson's own regulations manual, published several months later, contained no regulation against visitors. And the deputy sheriff who was present with the two uninvited visitors and then informed Dodson also violated the "no visitor" policy by not asking the women to leave, but no adverse action was taken against him.

The court submitted the case to the jury for return of a special verdict.[4] The jury specially found that both plaintiffs were performing their work satisfactorily; that they were terminated solely because of their political affiliation or beliefs; that Dodson did not act in good faith in firing them; and that the terminations were not reasonably related to the efficient operation of the department. On this basis damages were awarded to both plaintiffs. On Dodson's motion for judgment n.o.v. for trial errors, the district court declined to set aside the Jones verdict but granted the motion as to the Sedwick claim on the basis that

> because of the close and intimate relationships which exist between a sheriff and his chief deputy, defendant's discharge of the plaintiff from his position as the chief deputy sheriff of the Page County Sheriff's Department was properly related to the efficient, effective operation of the Department. No substantial evidence supports the jury's verdict for plaintiff.

jury's finding that Jones was performing her job adequately is clearly supported by the record and conclusively establishes for purposes of this litigation that Jones's performance was not the reason—or a contributing reason—for her discharge.

4. The special issues submitted and the jury's findings were essentially as follows:

I. Do you find from a preponderance of the evidence in the case that [Plaintiffs] were performing their work satisfactorily until they were terminated in September 1976? Answer "Yes" or "No" _Yes_

II. Do you find from a preponderance of the evidence in the case that [Plaintiffs] were

Dodson and Sedwick then took these cross appeals from the respective final judgments against them.

## II

These cross-appeals raise difficult constitutional and procedural issues growing out of the claims of two public employees that they have been discharged in violation of first amendment rights. The difficulty is compounded by the fact that controlling doctrine—both substantive and procedural—is still evolving and is by no means yet authoritatively settled in all its critical aspects. Indeed, following trial and our hearing of this appeal, the Supreme Court has made important further refinements or clarifications—both substantive and procedural—in that doctrine. *See Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (5 to 4 decision). Our first task is to draw from the critical Supreme Court decisions culminating in *Connick* the principles that control decision here, keeping in mind that neither the parties nor the two courts so far engaged in the process had the benefit of *Connick's* most recent teaching prior to submission of the case to this court.

Without attempting an exegesis of all the relevant decisions—a process recently undertaken in the majority and dissenting opinions in *Connick*—we draw from those decisions the following principles critical to decision here.

*First,* the root principle, itself of relatively recent origin, is that a state cannot condition public employment on a basis that infringes the employee's constitutionally

terminated in September 1976 solely because of their political affiliations or beliefs? Answer "Yes" or "No" _Yes_

III Do you find from a preponderance of the evidence in the case that Sheriff Ray Dodson acted in good faith in terminating [Plaintiffs] in September 1976? Answer "Yes" or "No" _No_

IV Do you find from a preponderance of the evidence in this case that the termination of [Plaintiffs] reasonably related to the efficient operation of the Sheriff's Office? Answer "Yes" or "No" _No_

protected interest in freedom of expression. *Keyishian v. Board of Regents,* 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967); *see Connick,* —— U.S. at ——, 103 S.Ct. at 1687.

■ *Second,* under this general principle, a public employee may not be discharged[5] for the expression of ideas on any "matter of legitimate public concern," *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), whether in a public forum, *id.,* or in private conversation with the employer, *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), unless the public employer's "interest in the effective and efficient fulfillment of its responsibilities to the public," outweighs the employee's interest in free expression of the ideas. *Connick,* —— U.S. at —— – ——, 103 S.Ct. at 1692–93.

Whether a particular expression was, in the first place, upon a matter of legitimate public concern is a question of law for the courts, *id.* at —— & n. 7, 103 S.Ct. at 1690 & n. 7; it is not a question of fact. If the expression was not upon a matter of legitimate public concern, no first amendment protection against discharge exists (though other first amendment protections may), *id.* at ——, 103 S.Ct. at 1690.

If the expression was upon a matter of legitimate public concern, the further question whether the employee's interest in making it may nevertheless be outweighed by the public employer's "interest in effective and efficient fulfillment of its responsibilities to the public" is also a question of law for the courts, *id.* at —— n. 10, 103 S.Ct. at 1692 n. 10. Resolution of this question requires striking the proper constitutional balance between the opposing interests, and this in turn requires weighing the degree of "public concern" legitimately had

in the particular expression of ideas—as measured by the expression's content and context—against the degree to which the employee's conduct is justifiably viewed by the public employer as an actual or threatened disruption of the conduct of government operations for which the employer is responsible. *See id.* —— U.S. at —— – ——, 103 S.Ct. at 1692–93. On this basis, expressive conduct which "[Touches] upon matters of public concern in only a most limited sense . . . does not require [a public employer to] tolerate action which he reasonably believe[s] would disrupt [his office], undermine his authority, and destroy close working relationships," *id.* at ——, 103 S.Ct. at 1693–94 (intra-office questionnaire respecting political pressures felt by fellow employees), while expressive conduct, concededly disruptive to some degree, which touches directly upon matters of grave public concern may not justify another discharge. *See, e.g., Pickering* (open criticism of public employer's allocation of public funds and method of informing public of revenue needs).

In making this balancing inquiry, the burden is upon the public employer to convince the court that the balance tips in favor of the governmental interest. *Id.* at —— n. 10, 103 S.Ct. at 1692 n. 10, 51 U.S.L.W. at 4439 n. 10.

■ *Third,* neither may a public employee be discharged solely because of the employee's political party affiliation, unless the employer can show that affiliation with the employer's party is essential to the employee's effectiveness in carrying out the responsibilities of the position held. *Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).[6]

---

5. By confining our discussion to the effect of discharges, we do not intimate that other alterations in the employment relationship may not also violate first amendment rights. *See DeJong v. United States,* 621 F.2d 618 (4th Cir. 1980) (transfer). Because only discharges are involved in the instant case, we limit discussion to that action.

6. This deliberately states the *Elrod-Branti* principle in terms narrowly confined to the specific facts of those cases, each of which involved discharges concededly based only upon the employees' party affiliations. We recognize that the principle might be thought to run as well to coerced political loyalty to individual employers (even of the same political party). *See*

■ *Fourth,* notwithstanding proof (or concession) that a public employee's discharge was based at least in part upon overt expressive conduct, party affiliation, or both, an employer may yet avoid liability for violation of protected first amendment rights by proving that the discharge would have been made in any event for reasons unrelated to any exercise of protected first amendment rights. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).[7] The burden to prove this avoidance defense is upon the public employer. *Id.* at 287, 97 S.Ct. at 576.

### III

From this it is obvious that in this type case it makes a great difference—indeed a difference likely to be dispositive—whether a discharge was solely for reasons of raw political patronage (party affiliation alone)

*McBee v. Jim Hogg County,* 703 F.2d 834, 838 n. 1 (5th Cir.), *reh'g en banc granted,* 703 F.2d 834 (1983); *see also Connick,* —— U.S. at ——, 103 S.Ct. at 1691 (*Elrod* and *Branti* prohibit "pressure to work for political candidates not of the worker's own choice"). The effect of such an extension of *Elrod-Branti* patronage discharge principles would be, however, necessarily to carry over to other discharges than those solely for party affiliation, the extremely narrow justification basis defined in *Branti.* We do not believe that test is suited to the "personal political loyalty" situation; it is too narrow. While it may adequately protect the only conceivable governmental interest in ensuring same-party affiliation of a public employee, it is not flexible or broad enough to protect governmental interests in avoiding a variety of employee "expressions" involving specific insubordination or dereliction of duty having a "political" tinge, or, conceivably, deliberately given a "political" cloak.

We therefore believe that raw patronage discharges of the *Elrod-Branti* type are properly treated as a narrow, special case within the wider category of first amendment discharges. Only in this narrow circumstance may the requisite balancing of governmental and individual interests appropriately be accomplished by the essentially rigid *Branti* inquiry. In the raw patronage situation both the individual and governmental interests are essentially fixed and unvarying in content. Balancing those interests from case to case does not require open-ended inquiry concerned with specific workplace relationships that may underlie overt expressive conduct. Where the protected activity

or was rather because of one or more specific episodes involving arguably protected "expressive conduct," or, on the contrary, was not solely for either, being instead, or in addition, for reasons unrelated to first amendment protected activity of either type. The dispositive importance of the actual reasons for a discharge are readily seen.

Raw patronage discharges of the *Elrod-Branti* type and overt expressive conduct discharges of the *Pickering-Givhan-Connick* type may be justified on different bases that are not necessarily congruent. A claim based upon a discharge that is—whether by concession or by proof—a "mixed motive" one of the *Mt. Healthy* type, will ordinarily be resolved simply by fact-finding that sorts out the motives under the *Mt. Healthy* "but-for" test, rather than by assessing any proffered justification for a discharge moti-

involves overt "expression of ideas," the more open-ended inquiry prescribed by *Pickering* and its progeny are required to accomplish the necessary balancing. This is so even where the arguably protected activity involves "political" speech or expression, *see Mills v. Alabama,* 384 U.S. 214, 218–19, 86 S.Ct. 1434, 1436–37, 16 L.Ed.2d 484 (1966)—particularly when the "political" speech impinges directly upon employee-employer relationships. *See Connick,* —— U.S. at —— — ——, 103 S.Ct. at 1689–94 (applying broader *Pickering* balancing test to employee's questionnaire concerning political pressure).

7. Although the impermissible motive in *Mt. Healthy* itself was overt expressive conduct, we agree with those courts that have applied the principle as well to party affiliation cases. *See, e.g., Nekolny v. Painter,* 653 F.2d 1164 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *Tanner v. McCall,* 625 F.2d 1183 (5th Cir.1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981). The *Mt. Healthy* procedure for sorting out mixed motives fairly accommodates to the reality that in practically any party affiliation discharge situation some unrelated reason may also be advanced by the employer. *See Nekolny,* 653 F.2d at 1168. By applying the *Mt. Healthy* proof scheme, the critical issue whether a discharge was solely for party affiliation reasons can be fairly addressed. If the employer does not carry its burden of proving that the discharge would have occurred irrespective of party affiliation, it can safely be taken that party affiliation was effectively the only reason.

vated only by expressive or associational conduct.

A critical issue in this type case is therefore likely to be the threshold motivational one: for what reason[s] was the employee discharged? If raised by the evidence, this is quintessentially a factual issue. In some cases, e.g., Branti and Pickering, the existence of a single, first amendment related motive—either raw patronage or overt expressive conduct—is essentially conceded, with defense being rested solely upon establishing the appropriate public-interest justification. In others, the evidence may only raise issues respecting the existence of mixed motives—one related, the other unrelated to first amendment protections—with the sole question being whether the unrelated motive was an independently effective one.

Unhappily for ease of disposition here, the situation in the instant case had no such limiting features. The pleadings and evidence here raised every conceivable variant on the motivational themes above identified.[8]

To the resulting problem of whether the complex motivational issue thereby raised was properly submitted to the jury and, if so, how it was determined, we will return later. We continue now with identification of the further issues presented for decision, depending upon how the threshold motivational issue may have been decided as to each claim.

If it were properly determined, as a matter of fact, that either of the discharges was solely for raw patronage reasons, then the defendant could escape liability for that discharge only by establishing the extremely narrow Branti justification: that affiliation with the public employer's political party was essential to the employee's effectiveness in discharging the responsibilities of the position held. Branti, 445 U.S. at 515–16, 100 S.Ct. at 1293. Whether this narrow justification is established presents an ultimate issue of law for the court, paralleling the justification issue in Pickering expressive conduct cases. See Mummau v. Ranck, 687 F.2d 9 (3d Cir.1982) (as matter of law, assistant district attorney subject to patronage discharge).[9]

If, on the other hand, it were properly determined as a matter of fact that either of the discharges was not solely for patronage reasons but was instead motivated to any significant degree by overt speech activity by the public employee, then the defendant could yet avoid liability for that discharge on either of two bases: (1) that the speech was not, however, upon a "matter of legitimate public concern," Connick, —— U.S. at ——, 103 S.Ct. at 1689; or (2) that though the speech was upon a "matter of legitimate public concern," the public employer's interest in the effective and efficient fulfillment of its responsibilities to the public on balance outweighed the employee's interest in engaging in the speech activity. Id. at ——, 103 S.Ct. at 1691–92. Each of these bases for avoidance of liability presents an issue of law for the court, with the burden to establish the factual predicates for each upon the defendant. Id. at —— & n. 10, 103 S.Ct. at 1692 & n. 10.

### IV

From the foregoing it is possible to suggest a general model for the trial of cases such as the instant one in which are presented a range of factual and legal issues respecting public employee discharges

---

8. Indeed, it is plain from the record that the parties have had great difficulty in settling upon the appropriate legal theories for resolution of these claims. On oral argument, counsel for claimants opined that the case involved a "hybrid" Branti, Pickering, Mt. Healthy factual/legal situation, and conceded difficulty in fixing upon its true nature within the conceptual framework established by those cases.

9. Although in some cases there may be embedded within the ultimate constitutional issue disputed questions of fact respecting the exact nature of an employee's duties, see Delong v. United States, 621 F.2d 618, 623 (4th Cir.1980); Nekolny v. Painter, 653 F.2d 1164, 1169–70 (7th Cir.1981), there would appear no significant question in the instant case respecting the essential nature of the two claimants' duties, so that no preliminary factual issues are presented.

arguably violative of the first amendment. Against such a model, the course of trial in this case may then be measured and the specific errors assigned by the parties assessed.

*First,* where, as here, the evidence raises genuine issues as to the actual reason for an employee's discharge, that motivational issue must of course be resolved by the trier of fact. On that resolution, all else turns. The evidence may support a variety of alternative findings: that the discharge was solely because of political party affiliation (raw patronage); that it was because of overt activity involving arguably protected speech (either solely or in addition to party affiliation); or that it was for mixed motives, one or more of which implicate first amendment interests (either raw patronage or overt speech) and one or more of which are unrelated to first amendment interests, with the dispositive issue then being whether the discharge would in any event have been made for any of the latter reasons. In a jury case the motivational issue must be presented in a way which clearly differentiates the alternative reasons which may be found on the evidence.[10]

*Second,* depending upon the jury's finding as to the actual reason for discharge, the court must then determine as a matter of law whether a constitutional violation has been established. If discharge solely because of party affiliation is found, this will involve applying the narrow *Branti* justification test. If a discharge for overt expressive conduct is found, it will involve application of the *Pickering-Givhan-Connick* balancing test. If a mixed motive discharge is found, it will involve a straightforward application of the *Mt. Healthy* principle to the jury's determination wheth-

er the discharge would have occurred irrespective of the protected activity.

## V

■ Measured against this model, we believe the district court's procedures for resolving the dispositive factual and legal issues were sufficiently flawed and prejudicial to the aggrieved parties to require new trials as to each of the claims.

The basic flaw we find as to both claims is the court's failure to elicit properly specific factual findings of the actual reasons for the two discharges. Most critically, the special verdict submission posing the issue whether the two plaintiffs were "terminated ... solely because of their political affiliation and beliefs" was not sufficiently precise, in light of the evidence adduced, to elicit a proper finding on the critical motivational issue. Neither from the bare text of the issue as submitted nor from the court's complementary instructions is it possible to determine whether this special verdict submission was intended by the court and presumably then construed by the jury to limit consideration to whether the discharge was solely because of party affiliation, *i.e.,* a raw patronage discharge. If it was so intended and construed (and its strongest indicia tend, though ambiguously, to suggest this) it was not a proper issue submission under controlling legal principles as to either of the discharge claims.[11]

## A

As to deputy Sedwick's claim, the issue so confined would improperly have limited the jury's consideration to whether he was discharged solely because of his party affiliation. While the evidence may marginally

---

10. Though this may theoretically be done by a general verdict submission, the complexities of the different legal issues raised depending upon the specific motivational finding suggest the wisdom of a special verdict submission.

11. As our analysis of the factual and legal issues indicates, the special verdict submission was also flawed in other respects. Aside from possible internal ambiguities, the "good faith" and "reasonably related to efficient operation"

issues, *see* note 4 *supra,* were not factual issues for the jury. To the extent they were raised, they were aspects of the constitutional balancing inquiry mandated by *Pickering* and its progeny, or, conceivably, were imperfectly phrased aspects of the *Branti* justification test. In either case, they involved questions of constitutional law for the court. *See* Part II *supra.* It does not appear that the court submitted them for an advisory verdict.

have supported such a finding,[12] there was also evidence from which the jury could have found that the real reason was not mere party affiliation, but, alternatively or additionally, his specific engagement in forbidden political activity. Both possibilities should have been submitted—clearly differentiated—to the jury. As indicated above, the jury's resulting finding as between the two possibilities would critically have affected the justification defenses thereby opened to the defendant.

■ This error in factual issue submission was then compounded by the district court's grant of judgment n.o.v. against Sedwick, overturning the jury verdict in his favor. This ruling was based on the court's perception that the verdict did indeed find party affiliation alone the effective reason for Sedwick's termination.[13] On this basis, the court ruled that under the *Elrod-Branti* test, Sedwick's discharge was justified because affiliation with the employer's political party was essential to the effective performance of his duties in this small rural sheriff's office.[14] We hold that in so ruling, the court misapplied the *Elrod-Branti* test.

The *Branti* emphasis, which now controls in raw patronage situations, is not upon size, or intimacy of working associations, or needs of discipline, but upon the extent to which the discharged employees engage in policymaking related to "partisan political interests" and have access to confidential information "bearing whatsoever on partisan political concerns." *Branti,* 445 U.S. at 519, 100 S.Ct. at 1295. Flatly rejected in *Branti* was any general notion that mutual trust and confidence could only exist be-

tween members of the same political party in an agency of the small size there involved. *Id.* at 520 n. 14, 100 S.Ct. at 1295 n. 14. But this rejected notion was also relied upon by the district judge here in finding *Branti* justification for Sedwick's termination.

Under the *Branti* test, we do not believe that the duties of deputy sheriffs, no matter what the size of the office, or the specific position of power involved, or the customary intimacy of the associations within the office, or the undoubted need for mutual trust and confidence within any law enforcement agency, could be found to involve policymaking related to "partisan political interests" and to involve access to confidential information "bearing ... on partisan political concerns." *Id.* at 519; *see Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir. 1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). On this basis we hold that if Sedwick's discharge was solely because of his political party affiliation, it could not as a matter of law be justified under the *Branti* test.

This being so, we might now resolve the Sedwick claim on the merits by directing reinstatement of the verdict and entry of judgment upon it, if we could but be satisfied that party affiliation alone was the reason found by the jury for Sedwick's discharge. But, as indicated, we cannot be sure. There is the possibility, which we cannot confidently dismiss, that the reason found was not party affiliation alone (or at all), but was instead (or in addition) Sedwick's specific political activity about which

---

12. Principally, of course, the reference in Dodson's termination letter referring to the interests of his political party. *See* note 2 *supra.*

13. This seems plainly indicated by the court's comment in ruling orally on defendant's motion for judgment n.o.v. that "it's almost demonstrated as a matter of law that party affiliation or party loyalty would be an appropriate requirement for the person occupying the Chief Deputy's position," followed by a specific reference to *Branti.* J.A. 52–53.

14. This ruling may ultimately have been based upon dictum emphasizing the small-size factor in this court's decision in *Ramey v. Harber,* 589

F.2d 753, 761 (4th Cir.1978) (Hall, J., concurring), *cert. denied,* 442 U.S. 910, 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979). Aside from the fact that the small-size distinction in *Ramey* was entirely by way of dictum, *Branti,* which followed *Ramey,* held that raw patronage discharges in a nine-person public defender's office were not justified under the *Elrod* test as therein modified. To the extent, therefore, that the *Ramey* small-size distinction may have had any vitality when decided under *Elrod,* we believe it has since been completely undercut by *Branti*'s refinement of the *Elrod* principle.

Dodson indisputably had earlier challenged him. If this latter reason was the one actually found, either alone or in conjunction with party affiliation, the dispositive legal issue thereby raised would not be a *Branti* justification, but justification under the *Pickering-Givhan-Connick* balancing inquiry. And, as indicated, a discharge not justifiable under the narrow *Branti* test might be so under the more open-ended inquiry mandated by *Pickering* and its progeny.

The district court did not make the latter inquiry. While under some circumstances we might be disposed to make it in the first instance on an adequately developed appellate record, we do not believe that would be appropriate here. We are not satisfied that the factual predicates for such an inquiry have been developed on the present record; nor that, given post-trial developments, notably the doctrinal refinements in *Connick,* it would be fair to hold the parties to the record as earlier made. In this situation, there is no recourse but to vacate the judgment on the Sedwick claim and remand for reopened proceedings designed to resolve the dispositive factual and legal issues in accordance with this opinion.

### B

■ As to Jones's claim, the vice of the special issue submission was that it invited—and may have produced—a finding that her discharge was solely because of party affiliation when the evidence would not support such a finding. Unlike the evidence respecting Sedwick's discharge which included Dodson's flat expression of concern for political party interests, that respecting Jones's discharge contained nothing comparable. Indeed, the only evidence from which such an inference might have been drawn were the undisputed facts that Jones's party affiliation was different from Dodson's and that her job performance up until the altercation immediately preceding her discharge was satisfactory. Weighing heavily against any such inference was the fact that Dodson was not then

engaged in any general housecleaning on raw patronage grounds,[15] and the evidence strongly suggesting that the discharge was rooted only in the specific altercation leading to it.

This evidence does not suffice, under the test of evidentiary sufficiency we apply to causation-motivational issues, to support an inference that Jones was discharged solely because of her party affiliation. It raises no more than a speculative possibility, short of the reasonable probability that we require. *See Lovelace v. Sherwin-Williams Co.,* 681 F.2d 230, 241–43 & n. 14 (4th Cir. 1982).

This being so, a verdict which by reason of ambiguity might have been based on such a finding cannot stand as the basis for judgment. The district court therefore erred in failing, on Dodson's motion for judgment n.o.v., to set it aside. Applying the same test, we must now correct that error by vacating the judgment and remanding for reopened proceedings. *See* Fed.R.Civ.P. 50(d); *see also Neely v. Eby Construction Co.,* 386 U.S. 317, 327–29, 87 S.Ct. 1072, 1079–80, 18 L.Ed.2d 75 (1967) (appellate court, on appeal from denial of motion for judgment n.o.v., may, consistent with Fed.R.Civ.P. 50, grant new trial as alternative to judgment n.o.v.).

### C

Without attempting to chart the course of further proceedings in full detail, we offer the following directions and suggestions in the interest of just and expeditious resolution of the two claims upon remand.

1. With respect to Sedwick's claim, the claimant should be allowed—if so disposed—to attempt proof in the alternative that he was discharged solely because of his party affiliation or, alternatively or additionally, that he was discharged for specific exercises of protected "speech." Of course the defendant should similarly be allowed to show appropriate legal justification for

15. As indicated by his retention of some members of the opposite party.

the discharge if the reason found includes overt speech activity by Sedwick.[16]

2. On Jones's claim, claimant should be limited to attempting proof that she was discharged for specific exercises of protected "speech." Any issue respecting her discharge solely for reasons of party affiliation has been resolved against her on the merits by our holding, and may not be reopened on remand. Correspondingly, defendant may and need only attempt to show justification under the *Pickering-Givhan-Connick* inquiry if Jones's discharge is found to have been because of specific speech activity.

3. On neither claim should defendant be allowed to attempt proof that the discharge was for reasons unrelated to the claimed exercises of first amendment rights. Any issue of unsatisfactory performance originally raised in the case has been resolved against the defendant without error. No *Mt. Healthy* mixed-motive issue remains in the case. *See* note 4, *supra.*

4. To insure the necessary specificity of finding on the motivational issue, the court should submit that issue for resolution by special verdict appropriately drafted in light of this opinion and the evidence adduced on remand.

5. The district court should rule as a matter of law and for the record on any justification defense requiring resolution on remand. The ruling should be in sufficient detail to show the court's application of the *Pickering-Givhan-Connick* inquiry to the evidence: i.e., whether particular speech was upon a matter of "legitimate public con-

cern" and, if so, whether the individual interest in expression or the government's interest in preventing it prevails in the first amendment balance.

6. In making application of the *Pickering-Givhan-Connick* balancing inquiry to either claim, the court should be particularly guided by the majority opinion in *Connick* as the most recent authoritative pronouncement of the factors to be considered and the mode of their application to public employee discharge claims.[17]

## VI

On plaintiff-Sedwick's appeal, the judgment in favor of defendant Dodson is vacated and the case is remanded for further proceedings consistent with this opinion.

On defendant-Dodson's appeal, the judgment in favor of plaintiff Jones is vacated and the case is remanded for further proceedings consistent with this opinion.

### VACATED AND REMANDED.

FAIRCHILD, Senior Circuit Judge, dissenting.

Judge Phillips, writing on behalf of the court, has carefully and thoughtfully analyzed the principles in this very difficult field. With all respect, however, I do not agree that a remand for a new trial is appropriate.

In my view, these cases turned on issues of fact which were adequately resolved by

---

**16.** If the reason found is party affiliation alone, Sedwick is entitled to judgment on the basis of our holding that a discharge for this reason could not, as a matter of law, be justified under the *Elrod-Branti* test.

**17.** In particular the court should be sensitive to those parts of the *Connick* opinion recognizing that: where a discharge is based upon overt "speech" and not solely upon party affiliation, it is relevant to the balancing inquiry to consider the importance of maintaining "good working relationships" to ensure "efficient and successful operation" of the public office involved, *Connick,* —— U.S. at ——, 103 S.Ct. at 1692; that where such "close working relation-

ships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate," *id.;* that the "manner, time and place" in which allegedly protected expression occurs is relevant to the balancing inquiry, *id.;* that the context may be of special importance where the "speech" occurs in the course of an "employment dispute concerning the very application of that policy to the speaker," *id.* at ——, 103 S.Ct. at 1693; and that in such situations "additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." *Id.*

the special verdict. If, by hindsight, one can see that the questions in the special verdict might have been more delicately refined, counsel for the parties must bear a degree of responsibility for the form of the special verdict and the instructions. In addition, I do not agree that justice requires affording the parties an opportunity to produce different evidence.

In the case of Clara Jones, the issue of fact which seems to have been posed by the evidence at trial is whether defendant discharged her because of her intention, disclosed in response to defendant's question, to vote for and support defendant's opponent, or whether he discharged her for misconduct, principally in having visitors while on duty.

This issue was relatively simple, clearly for resolution by the jury. Relevantly, the jury found that Jones was performing her work satisfactorily, that she was terminated solely because of her political affiliations or beliefs, and that defendant did not act in good faith in terminating her. It seems clear that the jury believed Jones' version of the facts.

In the case of Edward Sedwick, the issue which seems to have been posed was whether defendant discharged Sedwick because of his intention to support defendant's opponent, or whether he discharged him for misconduct in campaigning while on duty. Sedwick had invited the opponent and several others to his home. There was little, if any, evidence that the meeting included campaign activity nor that it occurred while Sedwick was on duty.

The jury found that Sedwick was performing his work satisfactorily, that he was terminated solely because of his political affiliations or beliefs, and that defendant did not act in good faith in terminating him. The jury must have found either that the meeting was not political, or that it did not occur while Sedwick was on duty. Defendant was evidently found to have been motivated by Sedwick's intention to support the opponent.

Defendant is a Republican. When he was appointed Sheriff, a large number of the employees were Democrats, as are Jones and Sedwick. Jones and Sedwick were the only Democrats discharged. The opponent was a Democrat, running as an independent. Jones and Sedwick happened to combine Democratic affiliation with support for defendant's opponent.

The court's opinion (footnote 6) indicates that in this context a public employee's support of a particular political candidate is to be treated differently from his affiliation with a political party. Discharge of employees because of party affiliation can be justified only under *Elrod-Branti*. Discharge for politically expressive conduct can be justified by applying the different test of *Pickering-Connick*. I am not clear why this is so. Both are primarily matters of belief and entitled to protection. It may be true, however, that belief in a specific candidate in a specific election is more likely, in the nature of things, to bring forth substantial political expression in the campaign than general belief in the principles of a particular party.

Assuming, however, as the court holds, that the *Connick* principles are to be applied to the situation where the public employee is being discharged because he intends to support a particular candidate, I see little in the record on which to reach a conclusion in favor of defendant.

Jones was not claimed to have indulged in any politically expressive conduct other than her response to defendant's question. Defendant claimed Sedwick engaged in a small meeting for political campaign purposes. The jury may either have found the meeting was non-political, or that it did not take place while Sedwick was on duty. At several points in his testimony, defendant disclaimed any interest in what the employees did while not on duty, and said he felt they should not be actively campaigning on duty.

Defendant, in his briefs, has argued that it was error not to direct a verdict in his favor, and that judgment *n.o.v.* as to Sedwick was proper. He has not sought a new trial. He has not suggested that he made any objection to the form of the special verdict or the instructions given. He has not argued that there was error as to either.

With all respect, I would affirm the judgment for Clara Jones. As to the judgment in favor of Dodson, I would reverse and remand for entry of judgment on the verdict in favor of Sedwick.