Richard DICKS, Plaintiff,

v.

CITY OF FLINT and James Sharp, individually and in his official capacity as Mayor, Defendants.

No. 86–CV–40135–FL.

United States District Court, E.D. Michigan, N.D.

March 21, 1988.

Susan Winshall, Susan Winshall & Associates, P.C., Southfield, Mich., for plaintiff.

Douglas M. Philpott, Brownnell, Andrews, Philpot and Piper, Flint, Mich., for City of Flint.

Kendall B. Williams, Parker, McAra, Williams and Parker, P.C., Flint, Mich., for James Sharp.

## MEMORANDUM OPINION

CHURCHILL, District Judge.

In this 42 U.S.C. § 1983 action, Plaintiff Richard Dicks charges that Defendant James Sharp constructively discharged him from one position and failed to hire him for another in retaliation for the exercise of his first amendment rights. Dicks is the former Deputy City Administrator and Sharp is the former Mayor of Defendant City of Flint, Michigan.[1] Plaintiff also asserts pendent state claims of retaliation under the Michigan Elliott–Larsen Civil Rights Act, M.C.L.A. § 37.2701, tortious interference with prospective business advantage, and intentional infliction of emotional distress. Defendants have jointly moved for partial summary judgment with respect to the first amendment claim, the tortious interference claim, and certain allegations of defamatory conduct.[2] The undisputed facts giving rise to this controversy are as follows.

Richard Dicks had been a police officer for the City of Flint for 25 years when he accepted the position of Deputy City Ombudsman in 1980. During his tenure as a police officer, Dicks was heavily involved in fighting racial discrimination in the employment and promotion of minority city employees. That involvement included participating in discrimination lawsuits against the city as well as the negotiation of an affirmative action promotional plan. He was also a leader in the political action group, Society of Afro–American People. As Deputy City Ombudsman, Dicks became privy to numerous complaints of racial and sexual discrimination within the Police Department. The city's affirmative action record was a major issue in the mayoral election of 1983, and Dicks actively campaigned against the incumbent administration in favor of soon-to-be Mayor Sharp on that issue. Consequently, when Sharp took office he invited Dicks to become a member of his administration as Deputy City Administrator for Police and Fire. At that time, Sharp also told Dicks that he would be considered for the position of Police Chief. Dicks accepted the Deputy City Administrator job in hopes of eventually becoming the Chief of Police. The Deputy City Administrator serves under and at the pleasure of the mayor as an adviser regard-

---

1. The existence of a municipal policy, a prerequisite to municipal liability, *see Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), presumably is based on the theory that Defendant Sharp's actions were those of an official "responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986); *see also City of St. Louis v. Praprotnik,* — U.S. —, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Sharp was also sued in his individual capacity.

2. Plaintiff's allegations concerning injury to his reputation resulting from defamation do not, of themselves, rise to the level of a constitutional violation. *See Paul v. Davis,* 424 U.S. 693, 712, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976). The Constitution does not protect against defamation. The defamation in this case, however, implicates the first amendment because it is alleged to have occured in retaliation for the exercise of first amendment rights. The constitutional harm charged, then, is a violation of Dicks' first amendment rights. *Rakovich v. Wade,* 819 F.2d 1393, 1397 (7th Cir.1987). As discussed *infra,* the nature of the retaliation is not dispositive. The validity of this claim will ultimately depend on whether Dicks' speech and beliefs were "protected" under the first amendment.

ing the adoption and implementation of administrative policies. The position also entails communicating the administration's policies to the public on occasion.

Upon arriving in office, the new administration was faced with the task of negotiating a labor contract with unionized Flint police employees. One of the more controversial provisions of the new contract was its affirmative action promotional plan. Dicks was one of the persons from whom the mayor sought and received advice as to the appropriate terms of affirmative action within the police department. In the course of formulating the administration's position with respect to affirmative action, however, Dicks and the mayor reached an impasse. Dicks disagreed with the mayor's proposed plan, which was ultimately ratified by the union, because it was limited to five years and because it provided no affirmative action benefits to women as a class. Dicks' strong conviction about the inappropriateness of the plan prompted him to sidestep the mayor's authority by encouraging union members to vote against it and, at one point, he walked out of a meeting when the mayor told him that he could not always have his way. Once ratified, the contract was presented to the Flint City Council for final city approval. Dicks was asked by the mayor to speak in favor of the plan before the city council, which he refused to do. When the council insisted on hearing Dicks' views on the proposed agreement, however, he spoke out at the city council meeting against the affirmative action provisions of the contract. The proposed contract was rejected that same night by a 5 to 4 vote; although the mayor's lobbying efforts succeeded in obtaining approval of the same contract 48 hours later by an 8 to 1 margin. While the mayor publicly stated that he had no problem with Dicks' outspokenness at the meeting, he privately told Dicks that it was his job to be a team player and to publicly support the administration's policies whether he agreed with them or not. Dicks unequivocally replied that he would not support future policies which in his opinion are wrong.

It was in this context that, when the time came to appoint a new Chief of Police, someone else got the job. Although Dicks' was one of four names submitted to the mayor by the hiring committee, Mayor Sharp had previously told one of the committee members that the appointment of Dicks would be problematic because of his disloyalty. Just before the new Police Chief was named, Sharp told Dicks personally that his chances for the appointment went out the window when he opposed the mayor's plan before the city council. Though Dicks was never asked to leave office despite his perceived disloyalty, he was systematically excluded from important policy decisions within the Sharp administration. Eventually, Dicks resigned from his position as Deputy City Administrator, believing that he could no longer be effective under the circumstances. Plaintiff Dicks claims that the above actions by Mayor Sharp and his administration are violative of the first amendment.

■ The Court proceeds from the proposition that "[t]he first amendment is implicated whenever a government employee is disciplined for his speech." *Waters v. Chaffin*, 684 F.2d 833, 837 n. 9 (11th Cir. 1982) (employee was demoted and transferred). While all of the leading Supreme Court decisions delineating the first amendment rights of public employees involve discharges, adverse employment actions short of termination may be just as "likely to chill the exercise of constitutionally protected speech." *McGill v. Board of Education*, 602 F.2d 774, 780 (7th Cir.1979) (employee was transferred). Accordingly, the first amendment principles are the same whether the retaliation takes the form of "altered employment conditions" or outright termination. *Allaire v. Rogers*, 658 F.2d 1055, 1058 n. 2 (5th Cir.1981) (employee's salary was reduced), *cert. denied*, 456 U.S. 928, 102 S.Ct. 1975, 72 L.Ed. 2d 443 (1982); *accord Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir.1987) (employee was demoted). Thus the fact that Dicks was not actually terminated does not foreclose the possibility of a first amendment violation.

██ The first amendment may be equally implicated, if at all, through the denial of a "carrot" as well as imposition of a "stick" in response to the exercise of protected speech. Though Dicks had no "right" to be appointed Chief of Police in terms of a constitutionally cognizable property interest, the Supreme Court has held that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).[3] The *Perry* Court specifically noted that this principle has been applied to denials of public employment, reaffirming previous decisions holding that nonrenewal of non-tenured teacher's contracts may not be based on the exercise of protected speech. *Id.* at 598, 92 S.Ct. at 2698. At least one circuit has applied *Perry* in this regard to the denial of a promotion to a government employee. *Robb v. City of Philadelphia,* 733 F.2d 286, 295 (3d Cir.1984); *cf. Bowen v. Watkins,* 669 F.2d 979 (5th Cir.1982) (applying first amendment principles to denial of promotion without reference to *Perry*). This Court finds the logic of *Perry* fully applicable to hiring decisions. An individual may be denied the privilege of public employment at the hiring stage, the firing stage, the promotional stage, or everyday through "altered employment conditions." "It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963). Whether the first amendment has been violated, therefore, does not depend upon the nature of the infringement. Otherwise, state officials could indirectly "produce a result which [they] could not command directly"—inhibiting free belief, expression, or association. *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958) *quoted in Per-*

*ry,* 408 U.S. at 597, 92 S.Ct. at 2697. The relevant inquiry is whether the sanction imposed or the benefit withheld is causally related to the exercise of protected activity under the first amendment.

The uncontroverted evidence indicates that Dicks' speech before the city council, as well as his strong unyielding beliefs about the inappropriateness of the police department's affirmative action plan, were "substantial" or "motivating" factors behind the Sharp administration's decision not to appoint him Chief of Police and to ostracize him from future policymaking decisions. Thus the causation requirement of *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) has been satisfied. The final and determinative issue is whether Dicks' beliefs and resulting speech, in the context of public employment, fall within the protections of the first amendment.

Public officeholders commonly find themselves in the constitutionally awkward position of overseeing subordinate employees who are also political adversaries. The temptation to "clean house" must be tempered in light of the first amendment. In their dual role as employer and instrument of self-government, officials must maintain discipline sufficient to effectuate their public mandate without unnecessarily restricting the freedom of their employees to participate in the political process. Whether a specific activity is "protected," meaning that the public employer is required to tolerate it, is determined on a case-by-case basis. The particular facts of this case implicate two distinct lines of Supreme Court cases, one dealing with speech and the other with political affiliation and beliefs. The common theme running through each line of cases is that, the seat of power may not be used to quell dissent or command allegiance of public employees unless their political activity is, as Professor Tribe puts it, "demonstrably incompatible with the mission of a given public agency or

---

**3.** This was not always the case. Justice Holmes oft-quoted statement represents the previous state of the law: "The petitioner may have a constitutional right to talk politics, but he has

no constitutional right to be a policeman." *McAuliffe v. New Bedford,* 155 Mass. 216, 220, 29 N.E. 517, 519 (1897).

calling." L. Tribe, American Constitutional Law 706 (1978).

### A. Political Speech

■ Under the speech cases, the threshold question has been whether the speech relates to "any matter of political, social, or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). If not, then the government employer is unrestricted by the first amendment in its response to employee expression, however unreasonable that response may be. *Id.,* at 145, 103 S.Ct. at 1689. In affording protection only to "speech concerning public affairs," the Supreme Court reasoned that such speech "is more than self expression; it is the essence of self-government." *Id.* at 145, 103 S.Ct. at 1689 (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964)). Courts must look to "the content, form, and context of a given statement" to ascertain whether it is "of public concern." *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690. There is no question in this case that Dicks' speech before the city council was of concern to the Flint community. He spoke during a session of the local legislative body, at the behest of that body, on a matter affecting the future representation of minority group members within the police department in light of past discrimination. The fact that the speech was made to the council, standing alone, would be sufficient. Additionally, the Supreme Court noted in *Connick* that the subject of discrimination is "inherently of public concern," whether it is discussed in public or private. *Id.* at 148 n. 8, 103 S.Ct. at 1690 n. 8.

Where, as here, speech is of public concern and adverse employment decisions have been linked to its exercise, the Supreme Court has adopted a balancing test to determine whether the first amendment has been violated. The interest of the employee in making the statement must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Ed-*

*ucation,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). While the Court has declined to circumscribe all of the factors that may be weighed in the balance, it has recognized the following considerations as relevant: whether the employee's speech undermined the authority of superiors, promoted disharmony among coworkers, interfered with regular operations, impeded the proper performance of the employee's duties, or had a detrimental impact on close working relationships for which loyalty and confidence are necessary. *Connick,* 461 U.S. at 151–53, 103 S.Ct. at 1692–93; *Pickering,* 391 U.S. at 570–73, 88 S.Ct. at 1735–37. Under *Pickering* and its progeny, "the state interest element of the test focuses on the effective functioning of the employer's enterprise." *Rankin v. McPherson,* —— U.S. ——, ——, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987).

The Supreme Court has not yet grappled with the problem of speech by a public official at the policymaking level of government. In dealing with discharges based on political affiliation, however, the Court has provided helpful insight into how it will likely treat the political speech and beliefs of high-level government officials, especially as bearing upon their political loyalty.

### B. Political Loyalty

■ The political loyalties and beliefs of government employees enjoy no lesser protection than does their political speech. "If the First Amendment protects a public employee from discharge based on what he has said, it must also protect him from discharge based on what he believes," *Branti v. Finkel,* 445 U.S. 507, 515, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574 (1980), "[f]or at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." *Abood v. Detroit Board of Education,* 431 U.S. 209, 234–35, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1972). Accordingly, only "an over-riding interest

of vital importance" on the part of the state can justify requiring specified beliefs as a condition of public employment. *Branti*, 445 U.S. at 515–16, 100 S.Ct. at 1293. Like the political speech cases, *Branti* emphasized the government's vital interest in the effectiveness and efficiency of its offices, in holding that an assistant public defender may not be terminated, consistent with the first amendment, solely because of his political affiliation. *Id.* at 517–20, 100 S.Ct. at 1294–95. The Court found political affiliation not to be "an appropriate requirement for the effective performance of the public office involved," because the specific duties of a public defender have no bearing on "partisan political interests or concerns." *Id.* at 518–19, 100 S.Ct. at 1294–95.

The *Branti* analysis departed from the bright line rule of *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) in favor of a position-by-position approach. *Elrod* held that only "policymaking" or "confidential" employees may be discharged based on their political beliefs or ideology. *Id.* at 375, 96 S.Ct. at 2690 (Stewart, J., concurring in the judgment). *Branti* modified *Elrod* somewhat by requiring a connection between the views held and the specific responsibilities of the job. After *Branti*, courts must consider whether the public employee occupies a position, the duties of which require his political beliefs and party commitments to be in conformity with those of his superiors. In other words, are the employee's political loyalties and beliefs inconsistent with the effective performance of his duties? Though the "policymaking" and "confidential" labels are no longer conclusive, the sensitive nature of these positions remains relevant to this inquiry. *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 240 (1st Cir.1986) (en banc), *cert. denied*, — U.S. —, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987).

What constitutes effective performance can be judged only in the context of a particular position. The sensitive political nature of certain positions heightens the likelihood that the political activities or views of their occupants will affect performance—positions involving "government decisionmaking on issues where there is room for political disagreement on goals or their implementation." *Jimenez Fuentes*, 807 F.2d at 241–42; *accord Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981). Personal or political loyalty is part of the job in some instances. One of the considerations recognized as pertinent to the *Pickering* balance is whether the government employee holds a position for which "personal loyalty and confidence are necessary to their proper functioning." *Pickering*, 391 U.S. at 570, 88 S.Ct. at 1735. As a panel of the Seventh Circuit put it, "[y]ou cannot run a government with officials who are forced to keep political enemies as their confidential secretaries." *Soderbeck v. Burnett County*, 752 F.2d 285, 288 (7th Cir.1985). *Branti* noted that, "the Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments." 445 U.S. at 518, 100 S.Ct. at 1295. *Elrod* made clear that the first amendment does not authorize government employees to use their positions in order to circumvent the democratic process. *Elrod* found political loyalty to be necessary on the part of public employees who are "in a position to thwart the goals of the in-party," to ensure "that representative government [would] not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." 427 U.S. at 367, 96 S.Ct. at 2687. Such employees have the ability to "make or break" policies, and it is their responsibility to "make" them. *Gonzalez v. Benavides*, 774 F.2d 1295, 1300 (5th Cir.1985), *cert. denied*, 475 U.S. 1140, 106 S.Ct. 1789, 90 L.Ed.2d 335 (1986); *accord Jimenez Fuentes*, 807 F.2d at 240–41 (elected officials need "significant facilitators of policy, people who have the personal and partisan loyalty, initiative, and enthusiasm that can make the difference between the acclaimed success of a govern-

ment agency or program and its failure or, more typically, its lackluster performance."). Under both *Pickering* and *Branti*, however, the views held or expressed must relate to the responsibilities of the job. It is of no consequence, after all, that someone is in a position to thwart certain policies if they are not apt to do so, or that someone lacks political loyalty if the position has no relation to politics.

■ Although the speech cases and the political affiliation cases emerged separately and without reference to one another, these parallel lines of authority dovetail in their analyses.[4] Both categories of cases look to whether political expression or beliefs conflict with the efficient and effective operations of the public office. When push comes to shove, the first amendment activity of public employees—speech, beliefs, or association—must yield in favor of effective government. For example, "[p]ersons who hate children and speak ill of them—something the First Amendment protects even without great enthusiasm— have no right to work for a public day care center." Tribe, *supra*, at 706.

### C. Conclusion

■ Turning to the case at hand, as an appointee in the Sharp administration, Dicks was bent on "having his way." He was so adamant in his views that he refused to accept or support the Mayor's policy decisions if he considered them to be "wrong." Although Dicks had the responsibility as Deputy City Administrator to further the administration's policies with respect to the police department, he did just the opposite when it came to the Mayor's position on affirmative action. Dicks attempted to sidestep the Mayor's authority and block the implementation of the administration's affirmative action plan by speaking against it before the city council and by lobbying the union to vote against it. Dicks privately and, by his actions, publicly disavowed any loyalty to the policies promulgated by the Sharp administration. In short, his unyielding views and resulting speech before the city council amounted to insubordination, and were directly at odds with the proper discharge of his duties. As Deputy City Administrator and, prospectively, as Chief of Police, Dicks would be in a position to hinder other policies with which he disagreed, at least those relating to the police department. Because this would "undercut" effective representative government, Mayor Sharp was perfectly justified in ostracizing Dicks from future policy decisions and in not appointing him Chief of Police. Sharp could have fired Dicks without violating the first amendment, although this may have been politically infeasible after the city council incident was publicized. As stated by the Fifth Circuit, "the First Amendment surely does not require elected officials to sit silently by while their appointed chief executive publicly disavows the officials' authority over him. It is no answer to suggest that the elected officials also can turn to the idea marketplace to allow their view to compete with the policymaker they appointed." *Gonzalez v. Benavides,* 712 F.2d 142, 148 (5th Cir.1983). Elected officials like

---

4. This case presents a unique set of facts. It not only involves multiple forms of retaliation in response to multiple types of first amendment activity, but the public positions at issue fall within the "policymaking" category of *Elrod.* Several Circuits have wrestled with these so-called hybrid cases, which implicate both *Pickering* and *Branti,* with varying results. *See, e.g., Rodriguez Rodriguez v. Munoz Munoz,* 808 F.2d 138, 144–45 (1st Cir.1986); *Horton v. Taylor,* 767 F.2d 471, 480–81 (8th Cir.1985); *Jones v. Dodson,* 727 F.2d 1329, 1335–38 (4th Cir.1984); *McBee v. Jim Hogg County,* 730 F.2d 1009, 1014 (5th Cir.1984) (en banc). In contrast to this opinion, none of the cases goes so far as to equate the *Branti* analysis with that of *Pickering.* The cases coming closest to this conclusion are those that read *Branti*'s reference to "political affiliation" as encompassing political beliefs or ideology, rather than mere party membership. *See Jimenez Fuentes,* 807 F.2d at 240–41. The narrow interpretation of "political affiliation" is completely inconsistent with the reasoning of *Branti,* which repeatedly referred to "beliefs," "commitments," and "partisan political interests and concerns." By contrast, mere party membership would rarely if ever constitute "an appropriate requirement for the effective performance" of any office at any level of government. *See Garretto v. Cooperman,* 510 F.Supp. 816, 819 (S.D.N.Y.1981) ("Membership in the same party as the President is not required for effective performance of a Cabinet office.").

Mayor Sharp may constitutionally deny public employment in key positions to those whose political expression and beliefs are "demonstrably incompatible" with the facilitation of their goals and policies.

Therefore, there has been no first amendment violation, and Defendants' motion for summary judgment will be granted on that claim. In light of the fact that there is no longer an anchor federal claim, the Court will exercise its discretion under *United Mineworkers v. Gibb*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) and dismiss the pendent state claims without prejudice. *E.g., Province v. Cleveland Press*, 787 F.2d 1047 (6th Cir.1986). An appropriate order will enter.