**Carl Joe WHITED, et al, Plaintiffs,**

v.

**J. Trigg FIELDS, et al, Defendants.**

**Civ. A. No. 83–0563–A.**

United States District Court,
W.D. Virginia,
Abingdon Division.

March 5, 1984.

Robert Galumbeck, Tazewell, Va., for plaintiffs.

Dennis E. Jones, Lebanon, Va., for defendants.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

Nineteen plaintiffs, all employees of the Russell County Sheriff's Department, filed this complaint on the 28th day of December, 1983, pursuant to 42 U.S.C. §§ 1981, 1983 and 1985, seeking a temporary restraining order to be followed by temporary and permanent injunctions, compensatory and punitive damages and attorneys' fees, because the newly elected Sheriff of Russell County, Virginia, J. Trigg Fields, did not rehire them. W.H. Price, the outgoing Sheriff of Russell County, had appointed all the plaintiffs pursuant to Va. Code § 15.1–48 (Repl.Vol.1981 & Supp. 1983), which sets forth the procedure for appointing deputies of constitutional officers. The employees' terms of office ended with the term of their principal, W.H. Price. The plaintiffs contend that their first and fourteenth amendment rights were violated in that the newly elected Sheriff Fields did not rehire any of the plaintiffs because of their political beliefs and political support for his opponent in the General Election in which Fields was elected Sheriff of Russell County, Virginia.

As of the filing of this suit, the defendant Fields already had appointed various persons to fill the positions of the plaintiffs, and they had been duly sworn to take office on the first day of January, 1984. The plaintiffs sought a temporary restraining order which this court granted on December 28, 1983, simultaneous with the filing of this suit. After setting this matter for a consolidated hearing for temporary and permanent injunctions pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, the court conducted the trial of this matter on various dates between January 3, 1984 and January 15, 1984, during which time the temporary restraining order was in effect and the original nineteen plaintiffs continued in office. At the conclusion of the testimony, the court entered a temporary injunction to remain in effect until the rendition of a decision on a permanent injunction. On January 3, 1984, Johnny Head was permitted to intervene in this action as a party plaintiff; however, neither the temporary restraining order nor the temporary injunction covers him, and he currently does not hold his position in the Sheriff's Department in Russell County, Virginia. Jurisdiction over this action is based upon 28 U.S.C. § 1343.

## STATEMENT OF FACTS

Russell County is a rural county situated in the Ninth Congressional District of Vir-

ginia and has a strong two-party tradition. Political patronage and discharges have been customary in Russell County, and Sheriff Fields, in his testimony, acknowledges that this existing tradition is proper. In 1979, the voters elected W.H. Price, a Republican, as Sheriff and he succeeded Sheriff Howard, a Democrat. While Sheriff Price testified that he replaced the employees of Sheriff Howard and did not consider himself bound to reappoint them, he stated that he selected his own deputies without regard to politics. When Sheriff Price decided not to run again, the testimony is that, by and large, the entire Sheriff's Department supported Price's chief deputy, Ken Martin, who was the Republican opponent of the defendant, Sheriff Fields, in the 1983 General Election. Upon the election of Sheriff Fields, thirty-four positions were available for him to fill in the Sheriff's Department, and of these thirty-four positions, Fields did not rehire twenty-nine employees from the previous administration. All twenty-nine persons had supported Ken Martin to some degree. Of the five individuals who were re-employed, three employees, a jailer and two deputies, did not work actively for the election of Ken Martin and were in fact Democrats. One of the other two employees, a cook, is related to Sheriff Fields. The other, a dispatcher, is an employee whose position is funded through the Russell County Board of Supervisors, not through the budget of the Sheriff; therefore, the Board of Supervisors has the power to hire that dispatcher.

The plaintiffs in this case hold various positions in the Russell County Sheriff's Department. Plaintiffs Fields, Breeding, Hobson, Conley Kiser, and Darrell Compton are jailers and, in such capacity, are responsible for the supervision of the jail and its inmates. Plaintiffs Parks, Purkey, and Patsy Compton are dispatchers whose primary responsibility is taking, receiving, assigning, and logging telephone and radio police calls to and from the Russell County Sheriff's Department. Plaintiff Elizabeth Ann Taylor is a cook whose major responsibility is preparing meals for inmates of the Russell County jail, and plaintiff Sammy Lou Rasnake serves as secretary to the Sheriff and performs clerical duties that are normally responsibilities of a secretary. The remaining plaintiffs are deputies sheriff in Russell County; their major tasks are to act as law enforcement officers and process servers. In addition, plaintiffs Beverlin and Kestner had investigatory duties, and plaintiffs Keys and Salyers served as sergeants with some supervisory duties. All twenty plaintiffs in this case filed applications for employment with Sheriff-Elect Fields on or before December 28, 1983. Beverlin and Whited submitted their applications on December 28, 1983, and the court is of the opinion that their applications actually were submitted into the hands of the Sheriff after the temporary restraining order was entered in this case. All the plaintiffs supported Ken Martin in his election campaign in varying degrees; however, the testimony shows that the plaintiffs were open and notorious in their support of Ken Martin by having bumper stickers on their cars and signs in their yards, attending rallies, working at the polls, furnishing monetary support, soliciting votes, and in some instances, participating as delegates to the Republican County Convention. Moreover, it generally was known throughout the county that the majority of the Sheriff's Department was voting for and supporting a straight Republican ticket.

All the plaintiffs are qualified and properly certified to serve in their respective capacities in the Russell County Sheriff's Department in regard to both legal qualifications set forth in the Code of Virginia and certified training programs. All the plaintiffs testified that they could be loyal to the defendant, Sheriff Fields, and that they felt that they could serve him faithfully.

The court is of the opinion that Sheriff Fields knew that the plaintiffs supported his opponent in the General Election. During the time that he was running for office, he held an appointed position in the courthouse near the jail and could not fail to see the bumper stickers and the campaign plac-

ards of the former Sheriff's personnel. Numerous statements which the Sheriff made to various individuals who asked him about the situation and whether they could obtain a job evince Sheriff Fields' state of mind regarding the nature of the appointments that he intended to make in the Department. Several witnesses testified that the Sheriff remarked on occasion that he had no control over his appointments to the positions with the Sheriff's Department and that the matter was "out of my hands." The defendant Fields denied making these statements. Ronnie Kiser testified that the Sheriff told him after the election that he would like to hire several deputies who were working under Sheriff Price but that those individuals had worked too hard against him. Darrell Compton testified that Sheriff Fields told him that many of his supporters were unemployed and that while he would consider the applications of the former Sheriff's personnel, he hoped there would be no hard feelings. On cross examination by Sheriff Fields' attorney, Patsy Compton stated that Sheriff Fields informed her father that someone had seen her working at the polls for Ken Martin and that he would be unable to employ her even though he previously had intended to retain her. The Sheriff also denied this statement. James Cassell, a life-long Democrat and presently a deputy sheriff and lieutenant under Sheriff Fields, stated to Ronnie Kiser that he hoped the Democratic delegates would "pick some good employees." Cassell testified that while he did not recall making such a statement, he did receive thirty-nine of forty delegate votes at a meeting held to make recommendations for employees of the Sheriff's Department. Alfred Lynn Blevins, husband of Mabel Blevins, testified that candidate Fields told him that while he liked the Blevins very much, it would be impossible under the circumstances for him to keep Mrs. Blevins on as a dispatcher because the Democratic Party would not let him hire her. Estil Harrell, a Russell County businessman who considers himself politically independent, testified that he desired to see the plaintiff Head continue in his position as a deputy sheriff because Head was a good man and because he traded at his service station. When Estil Harrell went to see Sheriff Fields to try to obtain a reappointment for Head, Fields told him that the Committee at Castlewood rejected him; however, he would present Head's name for consideration to the Committee at Honaker. Other testimony corroborated Harrell's evidence. Sheriff Fields submitted plaintiff Head's name to a meeting of Democrats at Honaker at which time the delegates to the Democratic County Convention voted upon the applicants for employment in the Russell County Sheriff's Department. Sheriff Fields stated that he hired three out of the five persons recommended for deputies sheriff at the Honaker meeting. The testimony of Radfert Rhea and Dempsey Combs shows that the defendant, Sheriff Fields, also called a meeting of the Castlewood District. The purpose of the meeting was to present to the individuals who attended as delegates to the Democratic County Convention, the applications of individuals who had applied to fill the positions of deputy, jailer, and dispatcher with the Sheriff's Department. Only those individuals who were delegates to the Democratic County Convention which selected Fields to run for public office in the 1983 General Election voted on the applications. By returning to the people who selected him as a candidate Fields fulfilled a campaign promise to request "recommendations" from the people. With Sheriff Fields presiding over the meeting, the delegates to the Democratic Convention cast votes for five deputy positions, two jailer positions, and two dispatcher positions in the Castlewood area. The evidence of Rhea and Combs is supported further by the fact that Sheriff Fields appointed all the persons whom the delegates "recommended" at the meeting. Coincidentally, the Democratic gathering chose Dempsey Combs, and he currently is serving as a deputy sheriff. The undisputed testimony by members of the Democratic Party, including A.K. Gilmer, Chairman, is that the defendant Fields promised the people that he would return to the Districts for

the input of the people before appointing those who received jobs under his administration. During cross examination of Sheriff Fields, he was asked to affirm whether he had made a statement to *The Lebanon News,* a weekly newspaper circulated in Russell County, to this effect: "They fought to keep me from this job. Now, they want to force me to give them a job." Sheriff Fields did not deny making this statement. Furthermore, in testimony before the court, Sheriff Fields stated that all the employees of former Sheriff Price had two strikes against them on election night, when he received the election returns indicating that the voters of Russell County wanted a change. From the foregoing testimony, the court is of the opinion that a substantial and motivating factor in Sheriff Fields' decision not to rehire the employees of former Sheriff Price was due to their exercise of constitutionally protected conduct, that is, of exercising their right of free speech to support a political candidate of their own choosing. *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Johnson v. Butler,* 433 F.Supp. 531 (W.D.Va.1977).

Did Sheriff Fields demonstrate by a preponderance of the evidence that he would have reached the same decision as to re-employment, in the absence of the plaintiffs' constitutionally protected conduct? The court is of the opinion that, from a review of all the evidence in this case, the foregoing question which is the second prong of the *Mount Healthy* case must be answered in the negative. The fact that twenty-nine out of thirty-four employees were not reappointed together with the reasons that Sheriff Fields gave to these people for not reappointing them leaves no doubt that the Sheriff's decision to rehire was based upon a purely political patronage decision, namely to not hire those persons who had opposed him politically but to replace them with persons who were friends and supporters. Sheriff Fields testified that as he campaigned around the county, he felt that he was running against the entire Sheriff's Department, not against Ken Martin, indicating that he ran against the plaintiffs collectively. He also revealed that he received many complaints that the Department had failed to live up to their duties as a group and that the public generally criticized their performance. Specifically, Sheriff Fields mentioned complaints of deputies failing to answer calls, harassing the citizens, "bashing in heads," and dilatorily serving process papers. Although Sheriff Fields had run for public office twice before and been narrowly defeated, on this occasion, he won by a landslide margin of over two thousand votes revealing the voters' great dissatisfaction with the Sheriff's Department which was supporting Martin. This evidence shows that the treatment of Sheriff Price's employees was as a group and that there was a wholesale failure to rehire rather than an individual consideration of each application. While Sheriff Fields testified that on the campaign trail he had received many complaints about the Sheriff's Department which necessitated replacement of the group, he presented no specific evidence as to any inefficiency or any impropriety in the performance of any individual plaintiff.

The evidence also shows that Sheriff Fields told numerous individuals, and the Sheriff admits, that he resented a letter which accompanied the applications of several employees of Sheriff Price. These letters were described as "letters of protest." The evidence discloses that basically the letter congratulated the Sheriff upon his election, stated that the individual plaintiff did not believe that he or she should be required to submit an application since he or she already was employed, and concluded with a statement that employees presently holding positions should be considered without having to reapply. These letters grew out of a meeting which the plaintiffs had with one another to determine what steps they should take to protect their jobs. The testimony showed that they had consulted with legal counsel in an effort to protect their legal rights and the attorney had advised them to attach such a letter to their applications. Sheriff Fields

stated to numerous individuals that he would not hire anyone who wrote him this letter and in his own testimony he affirmed this justification for his decision not to re-hire any employee of Sheriff Price who sent him a letter of protest. In oral argument before the court, the defendants' counsel conceded that the letter was a protected free speech document which some plaintiffs used in an effort to protect their rights. Therefore, any failure to reappoint the plaintiffs for the reason that they had written such a letter is retaliatory and is another abuse of the plaintiffs' first amendment rights.

## SUMMARY OF THE LAW

There is something fundamentally wrong with the concept that any federal judge should be telling a newly elected sheriff who his deputies shall be. The average citizen looks on in wonder and questions whether a federal court sitting in judgment should force a sheriff in Virginia to rehire the deputies of his predecessor whose terms of office have expired, leaving the sheriff no right to choose the persons who will work for him for whatever reason he sees fit. A citizen in Russell County, in addition, must ask himself why he bothers to vote and elect a sheriff who has campaigned on the promise of "cleaning house" and who is being sued by those deputies who were an issue in the campaign. We hear throughout the land a lament over the low participation of people in the privilege of voting. An obvious reason for this apathy of voters is the old adage that "the more people vote for a change, the more things remain the same." These citizens have every right to raise these questions and indeed, only a few years ago it was firmly rooted constitutional law that federal courts did not interfere with the political processes of state and local governments. In a case arising in Cook County, Illinois, when a new Democratic sheriff was elected, he dismissed several hundred incumbent deputies who were affiliated with the Republican Party and replaced them with people of his political party. The United States Supreme Court, in a plurality opinion, held that patronage dismissals restrict political belief and association and violate the first amendment of the Constitution of the United States. Therefore, public employees should not be forced to relinquish their right to political association as the price for holding a public job. *Elrod v. Burns*, 427 U.S. 347, 372–73, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976). Actually, only three Justices of the Supreme Court concurred in the plurality opinion which, when carefully read, is very narrowly based. Indeed, Mr. Justice Stewart concurred in the judgment of the plurality but did so with the belief that it applied to only nonpolicy-making, nonconfidential government employees. *Id.* at 375, 96 S.Ct. at 2690. In dissenting, Chief Justice Burger noted that only the week before this decision, the Court had rendered the decision in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) in which the down-grading of the states to mere departments of the federal government supposedly was slowed and some life was breathed into the tenth amendment. *Id.* at 375–76, 96 S.Ct. at 2690–91. In a dissenting opinion, Justice Powell showed a remarkable knowledge of the political system of the United States and the manner in which our basic two-party system of government has operated in this country. He pointed out that the tradition of duly elected office-holders being able to replace non-merit employees had served this country well in its political history and had contributed to the great success of democracy. He indicated that the plurality opinion would have the overall effect of diminishing the value of the first amendment, rather than promoting it. *Id.* at 388, 96 S.Ct. at 2696. While even the plurality decision recognized the fact that there may be exceptions to the prohibition against patronage dismissals and made an effort to characterize and define the exceptions, *Id.* at 363, 96 S.Ct. at 2684, subsequent events have shown that no one at this time can point to a solid line of exception to the doctrine set out in *Elrod*.

Indeed, Mr. Justice Stewart, whose vote was crucial to the plurality, was soon to find before he left the Court that his understanding of the *Elrod* decision was an illusion. *Branti v. Finkel,* 445 U.S. 507, 520–21, 100 S.Ct. 1287, 1295–96, 63 L.Ed.2d 574 (1980) (Stewart, J., dissenting). When the Supreme Court next considered patronage dismissals, the majority opinion in *Branti* stated as follows:

> In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

*Branti v. Finkel,* 445 U.S. at 518, 100 S.Ct. at 1294.

Furthermore, in *Branti*, it was held specifically that dismissed employees do not have to show that they were coerced into changing their political affiliation but it is enough for them to show that they were discharged simply because they were not affiliated with a particular party. *Id.* at 517, 100 S.Ct. at 1294. The *Elrod-Branti* doctrine does not apply and has nothing to do with the setting in which one is concerned with civil service jobs as opposed to non-civil service jobs. It would have no application whatsoever, for example, in the high councils of the federal government where certain policy-making and confidential types of positions are deemed to be of a political nature and are subject to change whenever the President changes, or, in the governors' offices in the various states where there are cabinet positions and sub-cabinet positions which are changed with the overturning of a political party. The Court in *Branti* illustrates the doctrine by example. An election judge would hold office solely because he was a member of a particular party; on the other hand, a coach of a state university's football team might formulate policy, but a state official could not fire the coach simply because he happened to belong to a political party which did not control the state government. The *Branti* decision goes on to state in

another vein that a governor actually might believe that the official duties of various assistants such as speech writers or press employees require these persons to be of the same political belief as the governor but this does not indicate that the governor would have the power to change anyone in an administration simply because he was of another political party. *Id.* at 518, 100 S.Ct. at 1294.

To put the *Elrod-Branti* doctrine in its proper perspective, the court reflects upon the respective constitutional offices which exist in Virginia. For example, most commonwealth's attorneys have one person working under them, a secretary. Can a commonwealth's attorney justify the fact that he would change the secretary used by his opponent whom he had just defeated in the election, or would he be subject to suit if he did not continue the employment of the secretary of his opponent simply because she belonged to the other party? It is obvious that a Pandora's Box is opened with the dagger of *Elrod-Branti* hanging over their heads. Anyone who would hold a constitutional office in Virginia, whether it be the governor, the lieutenant governor, or the attorney general of the Commonwealth, or whether it be the treasurer, the commonwealth's attorney, the clerk, or the commissioner of revenue of a county, who changes a person of a different political party when he comes into office is opening wide the door for suit.

It is little wonder then in the few years that have come and gone since *Elrod* that the lower courts have struggled to reach an answer to the question of whether or not there is an exception to the *Elrod-Branti* doctrine and if so, what it is.

The first court to be confronted with the problem involved in *Elrod* was this court, the United States District Court for the Western District of Virginia, where a suit was pending of an identical nature when the Supreme Court handed down the *Elrod* decision. Eventually, the United States Court of Appeals for the Fourth Circuit held that the *Elrod* doctrine did not apply

retroactively to a sheriff in Lee County, Virginia, who had taken office a few months before the Court rendered the *Elrod* decision. *Ramey v. Harber*, 589 F.2d 753, 760 (4th Cir.1978), *cert. denied*, 442 U.S. 910, 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979). In *Ramey*, the court, in dicta, indicates certain principles that it believed to be exceptions to what was then the *Elrod* doctrine. Circuit Judge Hall, in a concurring opinion, pointed out certain factual considerations which should be exceptions to the principles of *Elrod:* First, under a state statute, the deputies' terms of office ended with the sheriff's without expectation of being rehired; second, the deputies actually actively campaigned against the sheriff as well as held different passive political beliefs or membership in another political party; third, the deputies were not pressured to change parties or to donate money to the other party; and finally, the size and nature of a small county sheriff's office necessitated mutual confidence and cooperation that could not exist where there were hotly contested election campaigns with lingering bitterness. *Id.* at 761. It must be remembered, however, that the Fourth Circuit decided the *Ramey* case without the benefit of *Branti.* When one considers the facts in *Branti*, involving two employees in a public defender's office in New York, it is obvious that not only does the *confidential* nature of the job cease to be considered as an exception but the *smallness* of the office does not seem to be a decisive element in determining whether or not there is an exception to the *Elrod-Branti* doctrine. Indeed, the Fourth Circuit recently has reached this conclusion in a decision in which it states specifically that the statements made in *Ramey* are dicta and that while the small size distinction might have had validity under *Elrod*, it certainly does not under *Branti. Jones v. Dodson*, 727 F.2d 1329 at 1338 n. 14 (4th Cir.1984).

In cases arising from Florida and Texas, where the relationship between the sheriff and his employees is remarkably similar to the system in Virginia in that the laws in Florida and Texas provide that the terms of the employees of the sheriff expire with the end of the sheriff's term; the deputy sheriff is at least the *alter ego* of the sheriff; and the sheriff is absolutely liable for the acts of his deputies and especially in circumstances where a small office is involved rather than a large office, it has been held that an exception to the *Elrod-Branti* doctrine exists. *McBee v. Jim Hogg County, Tex.*, 703 F.2d 834, *reh'g granted*, 703 F.2d 846 (5th Cir.1983); *Barrett v. Thomas*, 649 F.2d 1193 (5th Cir. 1981); *Tanner v. McCall*, 625 F.2d 1183 (5th Cir.1980). In *McBee*, the Fifth Circuit stated as follows:

> It is not uncommon in a small community for a candidate to seek the office of sheriff on a platform espousing "a change." These "changes" are reflected by the very attitudes and actions of the very few officers whom the new sheriff has the power to appoint. The candidate is elected by voters who fully expect and demand such "changes" to be made. "[T]he freedom of voters to structure their representative government," *see Branti v. Finkel, supra*, 445 U.S. at 534 [100 S.Ct. at 1303] (Powell, J. dissenting), is a substantial governmental interest seriously infringed in the small county situation if a newly elected sheriff was unable to make a "change" by replacing those few deputies viewed by the voting public as the "alter ego" of the administration just voted out of office.

*McBee v. Jim Hogg County, Tex.*, 703 F.2d at 839. Thus, it is interesting to note that while the Fifth Circuit, in its cases construing *Elrod* and *Branti*, still considers that smallness makes a difference, the Fourth Circuit has repudiated its dictum and said to the contrary. *Jones v. Dodson*, 727 F.2d 1329 at 1338 n. 14.

It is of little wonder that the United States Court of Appeals for the Fourth Circuit again considering a case before Judge Turk of this court has stated:

> These cross-appeals raise difficult constitutional and procedural issues growing

out of the claims of two public employees that they have been discharged in violation of first amendment rights. The difficulty is compounded by the fact that controlling doctrine—both substantive and procedural—is still evolving and is by no means yet authoritatively settled in all its critical aspects. Indeed, following trial and our hearing of this appeal, the Supreme Court has made important further refinements or clarifications—both substantive and procedural—in that doctrine. *See Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (5 to 4 decision)

*Id.* at 1333.

The *Jones* court recognizes four different types of situations where political views are involved in discharges and sets forth certain standards which it believes should be followed depending upon the situation. The court points out that there is a difference whether the discharge was solely for reasons of raw political patronage involving party affiliation alone, whether it was in a category of more specific episodes of expressive conduct, or whether it was unrelated to the first amendment protected activity at all. *Id.* at 1335. The Fourth Circuit states the *Elrod-Branti* doctrine in very narrow terms as follows: "neither may a public employee be discharged solely because of the employee's political party affiliation, unless the employer can show that affiliation with the employer's party is essential to the employee's effectiveness in carrying out the responsibility of the position held." *Id.* at 1334 (Citations and footnote omitted).

This court previously has determined that this case represents a raw political patronage failure to rehire and is one in which the exception must be found, if at all, in *Elrod* and *Branti.* This court then will look to *Elrod* and *Branti,* the situation that exists in Virginia today, and the relationship between the sheriff and his employees in determining whether or not this case falls within an exception set forth in *Elrod-Branti.*

This court disagrees with the *Elrod-Branti* rule both from a standpoint of logic and justice. It is incongruent that a group could obtain their jobs as the result of their political beliefs and affiliations with no expectation to remain in office beyond the term of the person who hired them and yet later that a newly elected official may be forced to retain these employees for the same reason that they originally were hired. There is something radically wrong with a society that permits this action. We have become a government of the people by the people for the bureaucracy. The only result of the *Elrod* and *Branti* decisions is to simply freeze into public employment people whom the electorate have rejected.

One sees all across the spectrum, both on a federal and state level, examples of employees who have been frozen into a civil service type of status and who cannot be removed from their positions. At least, most of these people who are part of the bureaucracy on a federal and state level are there as the result of legislative or executive decisions and not edicts of the judiciary. Regardless of the source, a good case can be made that this ever increasing growth of bureaucratic government has not improved the quality of their services. Nevertheless, this court is bound by the precedent set by higher courts no matter how distasteful it may be. Therefore, the court will proceed to analyze this case within the narrow bounds of whether or not an exception in the *Elrod-Branti* doctrine applies in this case.

## THE PUBLIC POLICY OF VIRGINIA AND ITS RELATIONSHIP TO THE *ELROD–BRANTI* RULE

In *Elrod,* the exception to the doctrine of abolishing patronage is stated as follows:

[I]f conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the

benefit gained must outweigh the loss of constitutionally protected rights.

*Elrod*, 427 U.S. at 363, 96 S.Ct. at 2684. (Footnote omitted). In *Branti*, the rule is stated in even more narrow terms as heretofore quoted. *Branti*, 445 U.S. at 518, 100 S.Ct. at 1294. The Supreme Court also stated in *Branti* that

> [i]f the First Amendment protects a public employee from discharge based on what he has said, it must also protect him from discharge based on what he believes. Under this line of analysis, unless the government can demonstrate "an overriding interest" 427 U.S. at 368 [96 S.Ct. at 2687], "of vital importance," *id.*, at 362 [96 S.Ct. at 2684], requiring that a person's private beliefs conform to those of the hiring authority, his beliefs cannot be the sole basis for depriving him of continued public employment.

*Id.* at 515–16, 100 S.Ct. at 1293 (Footnote omitted).

In Virginia, a sheriff is a constitutional officer whose duties and compensation are defined by statute. Va. Const. art. VII, § 4. Since the sheriff is a constitutional officer and his duties are defined by statute, the law imposes upon him mandatory duties in many respects, including service of process. For his failure to execute a process without legal excuse, the law imposes penalties. *Narrows Grocery Co. v. Bailey*, 161 Va. 278, 286, 170 S.E. 730, 733 (1933). Not only is a sheriff in Virginia simply a creature of the constitution and the statutes but common law elements still control his function to a large degree. Public policy of Virginia has only one method in which a deputy of a constitutional officer even comes into existence; it provides that such constitutional officer may appoint one or more deputies "who may discharge any of the official duties of their principal during his continuance in office, ...." Va.Code § 15.1–48 (Repl.Vol.1978 & Supp.1983). Under the provisions of this section, the terms of the deputies of constitutional officers in Virginia end with the term of their principal. *Id.; Ramey v. Harber*, 431 F.Supp. 657, 663 (W.D.Va.

1977), *aff'd in part*, 589 F.2d 753 at 754–55 (4th Cir.1978). Under Va.Code § 15.1–131.8 (Supp.1983), minimum qualifications for a deputy sheriff are set forth: He must be a citizen of the United States, undergo a background investigation, have a high school education or pass the G.E.D. examination, possess a valid Virginia driver's license, and undergo a complete physical examination. This section also provides that upon the sheriff's request, the Department of Criminal Justice Services may waive these minimum requirements. While this court is aware that there is no reasonable expectation of continued employment, this factor alone is not sufficient to justify a non-renewal of employment because of political beliefs as set forth in *Elrod*. Nevertheless, it is important, in determining the public policy of a state, to note that the state has seen fit to terminate the deputy at the same time that the sheriff leaves office and then to see if this policy bears any direct relationship to an employee's effectiveness in carrying out his job. There is a difference, for example, in a school teacher who is operating under a year-to-year contract and who has not gained tenure and a deputy sheriff whose office expires with his superior.

Neither the teacher nor the deputy sheriff has a vested property interest in his job, but the teacher at least has an expectation that if the job is still available, the contract will be renewed if her performance has been satisfactory. To the contrary, a deputy sheriff is not a creature of contract. The law specifically tells him that he has no expectation of re-employment outside the personal relationship he has with the sheriff; that is, employment is conditioned upon beginning with a particular sheriff and ending with the same sheriff. He is not an employee of all sheriffs but only of "his sheriff." Indeed, as has been pointed out in both Florida and Texas, which have similar laws providing that the deputies' terms expire with the sheriff's, the courts have held that this is a factor to be considered in whether or not there is an exception to the *Elrod-Branti* rule. *McBee v. Jim Hogg*

*County, Tex.*, 703 F.2d at 838–840; *Tanner v. McCall*, 625 F.2d at 1186–87.

It should be noted, however, that in Florida and Texas, the courts considering the relationship between the sheriff and his deputies, have described the deputy as the "alter ego" of the sheriff. Therefore, these Courts have held that if the deputy is the alter ego of the sheriff, this factor is sufficient to make an exception to the *Elrod-Branti* rule. *McBee v. Jim Hogg County, Tex.*, 703 F.2d at 839; *Tanner v. McCall*, 625 F.2d at 1186. In Virginia, however, the relationship between the sheriff and his deputy is such that he is not simply the "alter ego" of the sheriff, but he is one and the same as the sheriff. The public policy of Virginia with regard to the relationship between the sheriff and his deputy is grounded in the common law and is stated in *Miller v. Jones*, 50 Va. (9 Gratt.) 584 (1853) in the following manner:

> There is another principle on which I think Miller is liable for the rents received by his deputies: And that is that a sheriff is liable *civiliter*, though not *criminaliter*, for all the acts of his deputies, *colore officii*. The doctrine applicable to the ordinary relation of principal and agent, or master and servant, renders the principal or master liable for the misfeasances and negligences of his agent or servant, in all cases within the scope of the agency or employment. Story on Agency, § 308. The former is not liable for the torts or negligences of the latter in any matters beyond the agency or employment, unless he has expressly authorized them to be done, or subsequently adopted them for his own use and benefit. Hence it is, that the former is never liable for the unauthorized, willful or malicious act or trespass of the latter. Id. § 456. And even in cases within the scope of the agency or employment, though the agent or servant may be a trespasser, and liable in an action of trespass, the principal or master is not; but is liable only in an action on the case for the damage consequential from his employing an unskillful or negligent agent or servant. *McManus v.*

*Crickett*, 1 East's R. 106. But on principles of public policy, the liability of a sheriff for his deputy is much more extensive. The acts and defaults of the deputy, *colore officii*, are considered in law as the acts and defaults of the sheriff, who is liable therefor in the same form of action as if they had been actually committed by himself. He cannot be imprisoned or indicted, but may be fined for the conduct of his deputy. *Woodgate v. Knatchbull*, 2 T.R. 156. In *Saunderson v. Baker*, 3 Wils.R. 309, it was decided by the court of common pleas as long ago as 1772, that trespass *vi et armis*, lies against a sheriff for the act of his bailiff in taking the goods of A. instead of the goods of B. under a *fi. fa.* Blackstone, justice, "thought the sheriff was answerable in an action of trespass *vi et armis* for the act of his officer, the law looking upon the sheriff and all his officers as one person; he is to look to his officers that they do their duty; for if they transgress, he is answerable to the party injured by such transgression, and his officers are answerable over to him. There is a difference between master and servant; but a sheriff and all his officers are considered in cases like this, as one person." The principle thus laid down by Blackstone, has been approved and followed in the subsequent English cases. *Crowder v. Long*, 15 Eng.C.L.R. 309; *Smart v. Hutton*, 28 Id. 367; *Raphael v. Goodman*, 35 Id. 455. In *Smart v. Hutton*, the sheriff's officer arrested a defendant under a *fi. fa.* and carried him to jail, where he remained about 20 days. Trespass for assault and false imprisonment was brought against the sheriff. His counsel argued that "there must be some limit to the doctrine that the sheriff is in all cases to be identified with his officer. The officer in this case acted entirely without authority from the sheriff, and with the grossest ignorance." But the Court of king's bench unanimously decided that the action was sustainable. The same principle has been approved and followed in Massachusetts.

Campbell v. Phelps, 17 Mass.R. [244] 246; *Knowlton v. Bartlett*, 1 Pick.R. 271. Also in New York, *Walden v. Davison*, 15 Wend.R. 575. In the case in 1 Pickering, the court said: "If the act from which the injury resulted was an official act, the authorities are clear that the sheriff is answerable; if it was not an official but a personal act, it is equally clear that he is not answerable. But an official act does not mean what the deputy might lawfully do in the execution of his office; if so, no action would ever lie against the sheriff for the misconduct of his deputy. It means, therefore, whatever is done under color, or by virtue of his office." In this case "there is no doubt that he professed to act as an officer, and that he made the plaintiff believe that he was so acting." The same in substance, is said in the case in 15 Wendell. But the principle has no where been more fully sanctioned than in our own state. *White v. Johnson*, 1 Wash. 159; *James v. McCubbin*, 2 Call 273; *Moore's adm'r v. Dawney*, 3 Hen. and Munf. 127. In *James v. McCubbin*, a deputy drove one man's property on the land of another, in order that he might levy a distress warrant on it; which he accordingly did. Trespass *vi et armis* was brought against the sheriff therefor, and was unanimously sustained by the court. Certainly no act of the deputy could have been more willful or unauthorized than this. But it was done by color of his office, and the sheriff was therefore held liable. In *Moore's adm'r v. Dawney* as in *Saunderson v. Baker*, and *Campbell v. Phelps*, before cited, one man's property had been taken under an execution against another, and the sheriff was held responsible in trespass. It may be proper to notice the case of the *United States v. Moore's adm'r*, 2 Brock.R. [317] 318, which might seem to be opposed to the principle. But the receipt of the money by the deputy marshal in that case, being on the service of the original process and not under execution, was without color, and probably without pretence of authority, and he could only have acted in receiving it, as the agent of the defendant.

*Id.* at 602–05.

 Thus not only is the sheriff liable civilly for the acts of his deputy in Virginia, but he also is liable criminally and can be fined for the conduct of his deputy. The most significant parts of the foregoing law which is today the public policy of Virginia are the words that as between a sheriff and his deputy they are as "one person." There can be no doubt that the statute regarding the appointment of deputies in Virginia is grounded upon a very good foundation: Since the sheriff is liable absolutely for all the acts of his deputies, the sheriff should have complete and unfettered control over who his deputies are and their oneness would include unilateral political beliefs. Such a policy, which existed at common law, has come down through the cases and statutes in Virginia and is even more important and vital today, as a matter of public policy, than it was when it was promulgated in ancient times prior to the adoption of the Constitution of the United States. We live in a different world from the one of our founding fathers, for our society is far more litigious and complicated than theirs. Neither the judges of King's Bench nor the framers of the Constitution, with all their foresight, could have envisioned that a time would come when public officials would be sitting ducks to be sued by everyone for not only their own acts but all the acts of subordinates no matter how petty or insignificant. The so-called civil rights suits (§ 1983) were unknown at common law and undreamed of by the founding fathers in the context of today's world; otherwise, the public policy of Virginia regarding constitutional officers might be different. Generally, it is held that between most public officials and their employees, that only an agency relationship exists; therefore, the doctrine of *respondeat superior* does not apply in § 1983 cases. *Monell v. Dep't of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir.1977).

However, as between a sheriff and his deputy, the doctrine of *respondeat superior* does apply, and a § 1983 case does not insulate the sheriff in Virginia. *See Witt v. Harbour,* 508 F.Supp. 378, 379–80 (W.D. Va.1980), *aff'd mem.* 644 F.2d 883 (4th Cir.), *cert. denied,* 454 U.S. 879, 102 S.Ct. 359, 70 L.Ed.2d 188 (1981). In *Scott v. Vandiver,* 476 F.2d 238 (4th Cir.1973), the United States Court of Appeals for the Fourth Circuit, in construing South Carolina law, which also was grounded in the common law, found that the sheriff was responsible for the acts of a deputy whom he had simply deputized had not sworn in formally as provided by law. The court held that the doctrine of *respondeat superior* did not insulate the sheriff from liability of persons that he has deputized. Circuit Judge Butzner, speaking for the court, stated as follows:

> English common law, which remains the law of South Carolina unless changed by statute, authorized a sheriff to summons bystanders to assist him in apprehending felons. 1 Blackstone, Commentaries 343; ... The sheriff's authority is implicitly recognized in S.C.Code Ann. § 53–199 (1962), which empowers a deputy sheriff to call out a *posse comitatus* to assist in arresting suspected violators of the law. It is apparent that this statute supplements, rather than supersedes, the common law. To hold otherwise would irrationally confer on a deputy sheriff powers greater than the sheriff's.

*Id.* at 240–41. (Citation and footnote omitted).

The court went on to say:

> It is appropriate, therefore, to look to South Carolina law to ascertain the sheriff's responsibility for the actions of his subordinates. * * * [A] federal court may resort to the state law of torts to supply the elements of the § 1983 claim; and defenses recognized by state common law may be raised to contest the § 1983 claim. Moreover, state law is available to a § 1983 claimant under the doctrine of pendant jurisdiction without the necessity of showing of diversity of citizenship.

> The Supreme Court of South Carolina has expressly ruled that a sheriff's responsibility for the acts of his deputy is not dependent on the doctrine of respondeat superior. Instead, liability is based on the deputy's position as the sheriff's representative for whose official acts the law holds the sheriff strictly accountable. * * * This rule, promulgated in accordance with the common law almost two centuries ago, has not been impaired by the passage of time.

*Id.* at 242–43. (Citations omitted).

■ It is obvious that, under Virginia law, the doctrine first espoused in the common law has come to its ultimate meaning. Under the public policy of Virginia, a deputy sheriff and the sheriff are one and the same, and there is no distinction. Is it not then a matter of vital government interest that the sheriff have complete and absolute control and authority over who his deputy sheriff will be regardless of any first amendment limitations if he is totally responsible for the acts of his subordinates? This court is of the opinion that unless this is the exception that the Court had in mind when it laid down the *Elrod-Branti* principles, then no exception exists and the Court should have so stated. To mandate that a sheriff must accept the deputies that he finds in office simply because they belong to another political party even though he is totally responsible for all their acts is incredible, and beyond the bounds of common sense.

The idea in law that the sheriff and his deputy are one is identical with the image that the sheriff and his deputies have with the public at large. This court accepts, therefore, as true the testimony of Sheriff Fields in this case that the election in 1983 in Russell County, Virginia was between him and Price's deputies, not between him and Martin. This is the rule rather than the exception in rural counties where there is a personal relationship not just between the sheriff and deputy but with sheriff and citizen and the deputy and citizen. In any election held in any rural county in these

United States, no matter how many other political races are on the ballot, the sheriff's race will attract the most votes. On the day following the election, the headlines will declare the victor in the sheriff's race; the other races, whether for judge, prosecutor, treasurer, or clerk, will be relegated to a position beneath or put on the inside pages.

From time to time in Virginia, efforts have been made to change the public policy of Virginia regarding sheriffs, such as to cut a sheriff's powers to that of process server with law enforcement in the hands of the state police, or to create a type of civil service for deputies. The General Assembly has rejected these modifications. This court believes that if the public policy of Virginia is to be changed from that which was established at common law, the Legislature should change it and not the federal court.

This court does not consider that this decision is at odds with *Elrod* or *Branti*. The principles set forth here represent one entirely different factual public policy than that considered in those cases. A "vital government end" is served in this case which is the public policy of Virginia as derived from the common law. The "benefit gained" is multi-faceted. But there is no higher benefit in all our system of government than that of preserving the benefit of a person's vote. All else is vanity. For this court to say that Sheriff Fields must hire his opponents as deputies to carry out his policies is the same as declaring the 1983 General Election in Russell County void.

Having found that Fields failed to rehire the plaintiffs in part because he believed he was following the will of the electorate, and that the public policy of Virginia serves a vital government end resulting in an exception to the *Elrod-Branti* doctrine, the question remains as to whether this exception applies to all the plaintiffs. First, as to the testimony of Fields, there is nothing to indicate that he included cooks, dispatchers, and secretaries in the group of people he was running against, nor does he in fact furnish any information as to any impropriety on their part. Second, the public policy of Virginia, discussed in great detail in this opinion, only relates to sheriffs' deputies, not to other employees. The court has found no public policy of Virginia with regard to sheriffs' employees other than deputies, except that their term ends with the sheriff. The undisputed evidence is that jailers take the same oath and have all the powers and duties of deputies. The acts of jailers, or their misdeeds in many instances, are as troublesome to the sheriff as the acts of his other deputies, since assaults are frequent in jail and its environs and escapes are fairly common. For the purposes of this opinion, the term "deputy" includes jailers.

On the other hand, cooks, dispatchers and secretaries who were not rehired by Sheriff Fields are pure patronage discharges not subject to any *Elrod-Branti* exception. An Order will be entered permanently enjoining Sheriff Fields from terminating the employment of Donna Parks, Charles Robert Purkey, Patsy Ann Compton, Elizabeth Ann Taylor and Sammy Lou Rasnake for political reasons. As to all other plaintiffs, judgment will be granted to defendant, Sheriff Fields.