**William M. HARRIS, Larry R. White, Plaintiffs,**

v.

**Ronald R. WOOD, Defendant.**

**Civ. A. No. 92–0108–C.**

United States District Court, W.D. Virginia, Charlottesville Division.

May 12, 1995.

Charles R. Haugh, Charlottesville, VA, for plaintiffs.

George Harrison Gilliam, Kimberly Ann Whittle, Gilliam, Scott & Kroner, P.C., Charlottesville, VA, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MICHAEL, District Judge.

On March 27–30, 1995, the court tried this section 1983 first amendment case involving an alleged politically motivated refusal to rehire two deputies of the Nelson County Sheriff's Office. The parties have submitted proposed findings of fact and conclusions of law. Consequently, this court is now called upon to determine whether the victor in the 1991 Nelson County sheriff's race, Ronald Wood, refused to rehire the Plaintiffs due to the fact that they campaigned for his opponent, William Harris, the incumbent sheriff and the father of Plaintiff Michael Harris. For the reasons stated in the following findings of fact and conclusions of law, the court finds that the Plaintiffs failed to prove that Wood refused to rehire them solely on the basis of protected political speech, and therefore the court will enter judgment in favor of Wood.

## I. Findings of Fact

William "Bill" Harris had served Nelson County as sheriff for nearly twenty years in 1991, when he finally lost the sheriff's seat to Ronald Wood, after being defeated first in a Democratic primary, and then, running as an independent, in the general election. The Plaintiffs, Michael Harris and Larry White, campaigned actively for Bill Harris. Michael Harris spoke in favor of his father when asked for his opinion, produced a script and a radio ad for him, and passed around petitions to get his father on the ballot in the general election. Larry White also spoke in favor of Bill Harris and passed around petitions for Harris while on duty. When Bill Harris lost to Ronald Wood, Wood refused to rehire the Plaintiffs. Donnie Graves, Wood's right-hand man after the election, told Harris that Wood refused to reappoint him due to his unsuitable general background and reputation. (Graves Tr. 361; D.'s Ex. 4; M. Harris Tr. 90–91.) Graves informed White that Wood refused to rehire him because of some of the things that had been said in the campaign and because White did not live in Nelson County. (Graves Tr. 307; White Tr. 34–35.)

The Plaintiffs believe that Wood retaliated against them for supporting his opponent and for criticizing Wood during the election campaign. White, indeed, launched a few verbal assaults on Wood, calling him a "bald-headed s.o.b." and a "chicken-shit," to others in the sheriff's department. (White Tr. 56–57.) There is no evidence, however, that White made these derogatory comments to the public at large. White did state to members of the public on occasion that Wood, when Wood served as a deputy, often failed to provide adequate back-up for his comrades in the field, and there is evidence that Wood was aware of these comments and objected to them. (White Tr. 26–27; Wood Tr. 597–98.) There is no evidence that Harris criticized Wood. Though others in the sheriff's office supported Sheriff Harris, including Gary Brantley, who wrote an editorial in the local paper on Harris's behalf, there is no question that the Plaintiffs were more active supporters of Harris's reelection bid. (Harris Tr. 131–132.) Among all of the deputies in the sheriff's department, including those who supported Sheriff Harris, and Leo Pugh, who ran as an independent against Wood, the Plaintiffs were the only deputies not rehired by Wood.

Wood argues that he refused to rehire Harris principally because the community objected to Sheriff Harris hiring his son in the first place, and this was a major issue in the election. According to Sheriff Harris's chief deputy, Leo Pugh, Harris lost the sheriff's seat after so many years primarily due to the fact that he hired his son Michael, just as the sheriff in Amherst county suffered defeat after hiring his son a few years earlier. (Pugh Tr. 185, 201, 204.) Wood justifies his decision not to rehire Larry White because another issue in the campaign was White's behavior in the Gladstone area of the county. Though White performed ably as a sheriff, the department received complaints about his attitude, the fact that he drove too fast, and the fact that he used the county's car for too much personal business. (Graves Tr. 301–02.) Wood places great emphasis upon the fact that, under Virginia law, he is required to post a bond upon assuming the office of sheriff, and is personally liable for the acts of his deputies, the safety of his deputies, and the safety of the general public. *See* Va.Code Ann. § 15.1–41 *et seq.* Due to the obligation imposed by the bond and the existence of respondeat superior liability, Wood argues, the court should place great weight on the complaints against White for speedy driving, the safety concerns presented by Harris's lack of full vision, and the court should defer to Wood's judgment about the fitness of the deputies he hires.

The court heard much testimony, mostly speculation, rumor, and innuendo, about Michael Harris and Larry White. Turning first to Plaintiff Harris, he was hired by his father as a deputy dispatcher in 1990 and, eight months later, was promoted to the coveted post of road deputy. Though Michael Harris ultimately proved to be a satisfactory deputy, initially Sheriff Harris's colleagues felt that the appointment would inspire resentment due to the appearance of nepotism. (Pugh Tr. 185.) Appointing his son posed other problems for the sheriff beyond nepotism

because Michael had developed a questionable reputation in Nelson County, a reputation perhaps unwarranted, stemming from his possible associations with others who were connected to drug use in the area. (Bowman Tr. 386; Kessner Tr. 369–70; Martin Tr. 460–61.) Various incidents from Michael Harris's past fueled the negative rumors about him. Most significantly, several years before becoming a deputy Harris had been involved in a late-night confrontation at the Trax bar in Charlottesville, where he pulled a gun to defend a friend, and in which an assailant shot at him seven times from behind, and hit him once in the head. He lost his right eye in the assault. Several of the deputies at the sheriff's office testified that they had responded to disturbances (loud parties mainly) where Harris had been involved as a youth, prior to his appointment as a deputy sheriff. (Graves Tr. 291; Kessner Tr. 368; Pugh Tr. 199.) Wood, basing his knowledge on second-hand rumor, believed Harris "liked to drink" and had violent outbursts. (Wood Tr. 562.) Harris "likes to give a little knuckle buster every once in a while," according to Wood. (*Id.*)

Rumors and innuendo aside, everyone associated with the Nelson County Sheriff's Department testified that Michael Harris performed well as a deputy. Leo Pugh, who initially expressed concern over the appointment, was "surprised" at how well Harris turned out. (Pugh Tr. 186.) Harris did quite a bit of undercover drug work, worked long hours, and generally got along well with his colleagues. During his tenure as a deputy, however, rumors about Harris's personal life continued to plague him. On June 24, 1990, Michael Harris was charged with reckless driving in a manner to endanger the life and limb of another person. The incident involved a fight between Harris and his then-estranged wife, in which Harris allegedly attempted to run down his wife's friend. The incident became public knowledge when reported in the Nelson County Times. Though the charges were dropped when Harris and his wife reconciled, he received a three-day suspension and a thirty-day probationary period at the sheriff's office. (D.'s Ex. 6.)

Larry White, while also a generally competent deputy, had his share of problems with the community and the sheriff's office. He did not talk much and often appeared to be in a bad mood, which, according to some deputies, made him difficult to work with. (Graves Tr. 301; Martin Tr. 454–55.) When White talked to the sheriff in Appomattox County about why Wood refused to rehire him, the sheriff told him that Wood said White was moody and would not talk to people at times. (White Tr. 632.) Moreover, White had been reprimanded twice by Sheriff Harris for complaints from Gladstone residents about White's speedy driving, and the sheriff's office received complaints from the sheriff of Appomattox County about White speeding through his domain. (Martin Tr. 458; Brooks Tr. 478; Phelps Tr. 425–26; Richardson Tr. 418–19.) White had been disciplined by the Nelson County Sheriff's Office on a few occasions for his lead-footed driving habits while not on emergency calls. (Brantley Tr. 221–22, 229; White Tr. 45–46; B. Harris Tr. 133, 134; Pugh Tr. 187–88.) Additionally, there was some amount of concern in the sheriff's office that White spent too much time at or near his home in Amherst County, or in Appomattox County where he worked part-time, and he often could not be reached by radio due to the relatively long distance from his home to the sheriff's office. (Brooks Tr. 476; Graves Tr. 357; Phelps Tr. 425; Wood Tr. 590.) According to several witnesses, White was sometimes rude to others in the community. (Brooks Tr. 478–79; Kessner Tr. 366; Goldstein Dep.)

Though many of the stories about Harris and Wood evaporate upon exposure to light, the stories nevertheless formed a cloud over the deputies in the Nelson County community during the time preceding the sheriff's election. According to Deputy Martin, a dispatcher, neither of the Plaintiffs had the trust of the sheriff's constituency. (Martin Tr. 467.) Occasionally individuals in the community who called for a road deputy preferred not to speak to Michael Harris because they did not have confidence in him. (Martin Tr. 464.) The public sentiment against White, apparently, stemmed mainly from his attitude.

Wood points primarily to this lack of public confidence in Harris and White to justify his decision not to rehire them. Wood also points to the fact that neither Harris nor White satisfied his revised sheriff's regulations, which required, among other things, that a deputy have 20/40 binocular vision and that deputies live in Nelson County. Harris had only one eye and White lived outside Nelson County. It has not been established that Wood adopted the regulations to serve solely as a justification for not rehiring the Plaintiffs, since Deputy Graves consulted with state police requirements and the common practice of other sheriff's offices, and Wood consulted with a local optometrist for advice to develop the vision requirements. It is unclear from the record, however, to what extent Wood based his decision not to rehire the Plaintiffs on the revised regulations. Graves mentioned the residency requirement (which ultimately was applied only to road deputies) to White as one reason Wood refused to rehire him, along with the statements made during the campaign. (Graves Tr. 307.) Graves did not mention the vision requirement to Harris, only that Harris's general background and reputation rendered him unsuitable for the job. (Graves Tr. 361, D.'s Ex. 4.)

After reviewing the evidence regarding the general nature of the Plaintiffs' reputations in the community, along with the various real and perceived problems with their performance, the court must determine whether these factors explain Defendant Wood's decision not to rehire them. The court will outline the first amendment retaliation analysis to be applied to these facts and then explain how the evidence supports the Defendant's claim that he based his decision not to rehire the Plaintiffs on legitimate non-discriminatory reasons.

## II. Conclusions of Law

### A.

■ Though, under Virginia law, a sheriff's deputies serve at the will of the sheriff, Va.Code Ann. § 15.1–48, and have no property interest in continued employment, *Jenkins v. Weatherholtz,* 719 F.Supp. 468 (W.D.Va. 1989), a sheriff may not refuse to hire an individual in retaliation for constitutionally protected political expression. The standard to be applied in a first amendment retaliation case is set forth in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. at 1684, 75 L.Ed.2d 708 (1983). The court must look at all the facts and circumstances of a case to determine whether speech is of a matter of public concern and, if it is, whether the employee's first amendment interest outweighs the employer's interest in an efficient and harmonious workplace. *Id.* at 146, 103 S.Ct. at 1689.

■ As the Supreme Court stated in *Connick,* "when employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." *Id.* Even if employee speech is protected, "when close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Id.* at 151, 103 S.Ct. at 1692. It is not necessary for the employer "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Id.* at 152, 103 S.Ct. at 1692. If an employee's speech activity occurs at the office, rather than outside the office to the public at large, such circumstances may support an employer's defense that the functioning of the office was endangered by the employee's conduct, and that the employer's interests outweigh the employee's first amendment interests. *Id.* at 153, 103 S.Ct. at 1693. Such a balance, however, can only be determined by comparing the nature and importance of the protected speech to the nature and importance of the employer's asserted interests. *Id.*

■ The employer may escape liability even if the employer fires an employee partly for engaging in speech that is protected un-

der *Connick*, by proving that the discharge would have been made in any event for reasons unrelated to any exercise of protected first amendment rights. *Jones v. Dodson*, 727 F.2d 1329, 1335 (4th Cir.1984) (citing *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The burden to prove this avoidance defense is upon the public employer. *Id.* at 287, 97 S.Ct. at 576.

■ In first amendment retaliation cases, where motive is central to the court's inquiry, the court must often look to circumstantial evidence since direct evidence of motive rarely exists. As Judge Phillips explained in his concurrence in *Collinson v. Gott*, 895 F.2d 994 (4th Cir.1990), several factors are relevant to this inquiry: whether there are "any internal inconsistencies" in the defendant's story; "extrinsic circumstances" surrounding the challenged action, such as a defendant's treatment of a similarly situated employee, that would support allegations of improper motive; or the existence of non-discriminatory reasons for a challenged action. *Id.* at 1002–03. Though Judge Phillips outlined these relevant factors in the course of describing the qualified immunity inquiry under the first amendment, they are equally applicable to the test on the merits.

### B.

■ The only direct evidence of illicit motive in this case is Wood's statement that he objected to some of the things White said during the campaign. At trial Wood reaffirmed the fact that he refused to rehire White partly for statements made during the campaign, and Graves told White that Wood refused to rehire him partly for the campaign-related statements. It is unclear, however, whether Wood primarily objected to the public statements by White that Wood refused to back him up, or the personal attacks made by White at the sheriff's station, where he called Wood a "bald-headed s.o.b." and a "chicken-shit." As far as Harris is concerned, there is no direct statement from Wood that he refused to rehire Harris for political reasons. Graves told Harris that Wood refused to rehire Harris due to his general background and reputation.

With this evidence in mind, the court turns to the factors mentioned by Judge Phillips in *Gott*. First, the Plaintiffs have emphasized at trial and in their proposed findings of fact that, despite all of the rumors and negative opinions about White and Harris, Wood has stated that he did not speak to anyone in the community to check out the stories. Therefore, they argue that Wood's reliance on these rumors to justify his decision not to rehire the Plaintiffs shows that the rumor justification is a pretext and that his story is inconsistent. The court cannot agree. The record reveals that Wood was thoroughly familiar with the reputation of White and Harris in the community. Through Wood's deposition and testimony, and the testimony of his closest ally after the election, Deputy Graves, it appears that the negative rumors entered into Wood's decision-making process.

Second, the fact that Wood rehired all of the other deputies, many of whom actively supported Sheriff Harris, supports the conclusion that his actions were not politically motivated. While it is true that White and Harris were the most vocal supporters of Sheriff Harris, and Wood refused to rehire them both, other deputies supported Harris, Leo Pugh ran against Sheriff Wood as an independent, and Gary Brantley wrote an editorial in the paper supporting Sheriff Harris. Wood rehired all of these deputies.

The third factor mentioned by Judge Phillips is whether legitimate reasons justify an employer's allegedly retaliatory action. Numerous reasons have been tendered by the Defendant, and are supported by the evidence at trial, including the fact that nepotism was a major concern in the community when Sheriff Harris hired Michael Harris, Michael Harris had a tainted reputation in the community, and Wood was aware of complaints about White's attitude and driving habits. Moreover, Wood had a legitimate interest in protecting the harmony of his new sheriff's department. Wood was entitled to take into consideration whether Harris's close association with his father would undermine Harris's loyalty. Wood was also entitled to consider whether he could work closely with White, who had called him epithets in the presence of other deputies at the sheriff's

office. Other deputies, including Deputy Martin in particular, did not believe Wood could expect loyalty out of either of the Plaintiffs. The need for harmony in the workplace is substantially heightened in public safety positions. *Dunn v. Carroll,* 40 F.3d 287 (8th Cir.1994). The court accordingly gives strong weight to the concerns about Harris and White brought out at trial, particularly in light of the fact that Wood must post a bond upon assuming office and is personally liable under Virginia law for the acts of his deputies, the safety of his deputies, and the safety of the general public. *See* Va.Code Ann. § 15.1–41 *et seq.; see also Whited v. Fields,* 581 F.Supp. 1444 (W.D.Va. 1984) (sheriff in Virginia may be fined for the acts and omissions of his deputies under principles of respondeat superior).

At most, the Plaintiffs have shown that Wood may have refused to rehire White partly because of White's statements in public that Wood did not provide adequate back-up when on call. The evidence supports the fact, however, that Wood refused to rehire White at least in part for legitimate non-discriminatory reasons. Though the court places some weight on White's driving record, the most important fact brought out at trial is that some citizens did not like his demeanor and others in the police department, including Wood, found him to be moody and unpleasant. A sheriff should hardly be expected to rehire a deputy who has repeatedly called him derogatory names in the presence of the sheriff's former colleagues and future subordinates. *Connick* does not require such tolerance where the employee's speech is in the form of a personal attack, with no apparent expressive content beyond personal antipathy.

There is no evidence that Wood refused to rehire Harris due to Harris's political conduct. The overwhelming weight of the evidence supports Wood's contention that nepotism was a major factor in Sheriff Harris's defeat and that the community disapproved of Harris being hired as a deputy. Wood, acting with the advice of Deputy Graves, decided not to rehire Harris at least in part because of the negative opinions about him in the community. As Graves testified, Wood

and Graves "just didn't want [Harris] working with a newly formed organization with the cloud of mistrust through the community, for lack of a better word." (Graves Tr. 297.) The fact that many of the rumors are untrue may be unfair to Harris, but a newly elected sheriff is entitled to listen to the voice of the community in which he serves.

### III. Conclusion

For the foregoing reasons, the court will enter judgment in favor of the Defendant. An appropriate Order will this day issue.